UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
RAFAEL JIMENEZ,                          :    16 Civ. 8545 (AJN) (JCF)
                                         :
            Petitioner,                   :         REPORT AND
                                         :         RECOMMENDATION
      - against -                         :
                                         :
LYNN LILLEY, Superintendent               :
Woodbourne Correctional Facility,         :
                                         :
            Respondent.                   :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE ALISON J. NATHAN, U.S.D.J.:

     Rafael Jimenez brings this petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254, challenging his conviction

following a jury trial in New York State Supreme Court, Bronx

County, for second degree murder.  He argues that: (1) he is

actually innocent; and (2) he was denied due process of law in

violation of Brady v. Maryland, 373 U.S. 83 (1963), as a result of

witness tampering by the police.  The respondent argues, among

other things, that the petition should be denied as time-barred

under the statute of limitations established by the Antiterrorism

and Effective Death Penalty Act of 1996, 28 U.S.C. § 2244(d)(1)

("AEDPA").  In response, the petitioner asserts that the petition

is timely, and, if it is not, that any procedural bar is excused

because he is actually innocent.  For the reasons set forth below,

I recommend that the "gateway" actual innocence claim be accepted

so that the petitioner's claims may be considered on the merits.[1]

Background

A.    The Crime

At approximately noon on June 25, 1992, Carmen Velazquez and her seven-year-old stepdaughter were on their way to a supermarket in the Bronx when they passed a group of men standing in front of a convenience store.  (Tr. at 159-61, 182).[2]  One of the men from the group began harassing Ms. Velazquez, "throwing kisses" and calling her names.  (Tr. at 162, 192-93).  She testified at trial that was too afraid to look at or respond to her harasser.  (Tr. at 162, 181, 188).  On her return home from the supermarket, she and her stepdaughter again passed the group of men in front of the store, and one of the men stepped from the crowd and spit at her. (Tr. at 162-63, 198).  Ms. Velazquez testified that she again did not look at the men.  (Tr. at 163, 200).

Shortly thereafter, around 1:00 p.m., Ms. Velazquez spoke on the phone to her husband -- the victim, Michael Brana -- about the incident.  (Tr. at 163-64, 201).  Upset, Mr. Brana returned home from work early, at about 3:00 p.m., and spoke to Ms. Velazquez in

---

[1] Even though I am not resolving the petition on the merits, I am submitting my findings on the gateway issue now in the form of a report and recommendation because this is potentially a case-dispositive question.

[2] "Tr." refers to the transcript of Mr. Jimenez's trial in State court.

their apartment building at 1105 Jerome Avenue. (Tr. at 164, 201-02). Mr. Brana then went outside and Ms. Velazquez returned upstairs to their apartment. (Tr. at 164, 203). A short time later, around 4:00 or 4:30 p.m., Ms. Velazquez joined Mr. Brana outside, where he was standing, drinking a beer, and watching for the man who had harassed Ms. Velazquez. (Tr. at 164-66, 203-04, 208). At some point, Harry Ramos, an acquaintance, joined them in front of the building. (Tr. at 251-52). He and Ms. Velazquez urged Mr. Brana to go upstairs and avoid a confrontation. (Tr. at 166-67, 252, 261). Mr. Brana, still upset, refused. (Tr. at 167).

Shortly thereafter, a group of approximately five men approached. (Tr. at 167, 215, 245, 252). An altercation ensued, but the recollections of Mr. Ramos and Ms. Velazquez differ.

According to Ms. Velazquez, a short man stepped forward from the group, pointed to a man standing behind him, and asked Mr. Brana if that was the man Mr. Brana was looking for. (Tr. at 167, 210, 218). Ms. Velazquez stated at trial that based on the short man's accent, she believed the group of men to be Dominican. (Tr. at 209-10). Mr. Brana responded that he was not looking for anyone. (Tr. at 167-68). Then the short man stepped aside and the man who was standing behind him pulled a gun from his waist and shot Mr. Brana three times. (Tr. at 168-70, 211). Ms. Velazquez testified that she had an unobstructed view of the shooter's face

3

for about thirty seconds from a distance of about eleven feet. (Tr. at 169-71). After the shots were fired, Ms. Velazquez fled to her apartment building, ran upstairs, and called the police. (Tr. at 172). Shortly thereafter, an ambulance transported Mr. Brana to the hospital, where he later died. (Tr. at 174).

According to Mr. Ramos, the men, whom he believed to be Dominican, approached Mr. Brana, and they exchanged words about the harassment of Ms. Velazquez. (Tr. at 252). One member of the group then punched Mr. Brana. (Tr. at 252-53, 257). Mr. Brana put up his fists and moved toward the man that had punched him, but that man moved out of the way, exposing the shooter. (Tr. at 253-54, 257-58). Mr. Ramos had known the shooter by the nickname Monaguillo for one or two years. (Tr. at 254, 263-65). According to Mr. Ramos, the shooter said to Mr. Brana, in Spanish, "[H]ey cocksucker what is it that you want?"[3] (Tr. at 254, 258, 264). The shooter then pulled a gun from his waistband and shot Mr. Brana three times. (Tr. at 253-54, 258). Mr. Brana then tried to grab the shooter, who fired a fourth shot into Mr. Brana's forehead.[4]

_____

[3] Mr. Ramos testified in Spanish at trial; his testimony was translated to English for the court and the jury. (Tr. at 248).

[4] Mr. Ramos' description of the shooting is consistent with the trial testimony of Associate Medical Examiner Pierre-Marie Charles, M.D., who performed the autopsy of Mr. Brana. (Tr. at 274). He testified that Mr. Brana was shot four times: in the left side of the abdomen, right forearm, right leg, and left side of the head. (Tr. at 277-83). The head wound was surrounded by

(Tr. at 258). Mr. Ramos ran inside after Ms. Velazquez and yelled for her to call the police. (DD5 Police Report dated June 26, 1992 ("Ramos DD5"), attached as Exh. 2 to Declaration of Glenn A. Garber dated Nov. 4, 2016 ("Garber Decl."), at 1).

B.  Pretrial Identifications

Approximately one-half hour after the shooting, Ms. Velazquez spoke to Detective Floyd Coor and Detective Kenneth Thompson in her apartment. (Tr. at 172, 181-82, 246, 286-88, 324). She told the detectives about the shooting and described the shooter as twenty-five to twenty-six years old, about five feet six inches tall, with three to four inch long black hair worn in a Jheri curl style, tanned olive-colored skin, and a light mustache and goatee, and wearing a white tank top and khaki-colored shorts. (DD5 Police Report dated June 25, 1992 ("Velazquez DD5"), attached as Exh. 1 to Garber Decl.; Tr. at 172-73, 177, 212-13, 232-34). Ms. Velazquez also said that he "[s]eemed Dominican." (Tr. at 232). Following the interview, Detective Thompson brought Ms. Velazquez to the 44th Precinct "Rip Unit" to view photographs, but she was unable to identify the shooter. (Tr. at 36, 55-57). According to Detective Thompson, Mr. Jimenez's photograph was not among those she viewed

_____

stippling, indicating that the bullet was fired at close range -- approximately two to eighteen inches from Mr. Brana's head. (Tr. at 279).

that day.  (Tr. at 56-58).

The next day, Detective Thompson spoke to Mr. Ramos.  (Tr. at 289-90).  Detective Thompson did not ask Mr. Ramos for a description of the shooter because Mr. Ramos "knew the subject." (Tr. at 62, 290).  Instead, Mr. Ramos was brought into the 48th Precinct "Catch Unit" to view photographs of potential suspects. (Tr. at 37-38, 57; Ramos DD5 at 1-2).  According to Detective Thompson, the photographs Mr. Ramos viewed were different from the photographs Ms. Velazquez had viewed the day before.  (Tr. at 57-58).  The photographs were displayed in trays, each containing several hundred photographs.  (Tr. at 38).  From these, Mr. Ramos positively identified a photograph of Mr. Jimenez.  (Tr. at 39, 58-62; Ramos DD5 at 2; Lineup Notes, attached as Exh. 7 to Garber Decl., ¶ 2).

Based on Mr. Ramos' identification, Detective Thompson ordered a more recent photograph of Mr. Jimenez from the Police Department Photo Unit and assembled a photo array, which was shown to Ms. Velazquez later that day.  (Tr. at 43-44, 46, 63-65).  She immediately identified Mr. Jimenez.  (Tr. at 44-45; DD5 dated June 26, 1992, attached as Exh. 3 to Garber Decl.).

Based on these identifications, Detective Thompson attempted to locate and apprehend Mr. Jimenez.  (Tr. at 291, 295).  When his initial efforts did not succeed, Detective Thompson requested that

a wanted poster be prepared and circulated citywide.  (Tr. at 67, 294-95; Wanted Poster dated Sept. 2, 1992 ("Wanted Poster"), attached as Exh. 4 to Garber Decl.).  On October 14, 1992, Mr. Jimenez was arrested and brought to the 48th Precinct.  (Tr. at 48-49, 65, 291).

On October 15, 1992, he was placed in a lineup.  (Tr. at 49-50, 68, 293-94).  Mr. Ramos viewed the lineup first.  (Tr. at 68).  Detective Thompson testified that Mr. Ramos' father accompanied him to the precinct and seemed to discourage Mr. Ramos from getting involved in the case or making a positive identification.  (Tr. at 75-76).  Detective Thompson also stated that Mr. Ramos seemed apprehensive about viewing the lineup.  (Tr. at 74).  Mr. Ramos viewed the lineup for a few minutes but did not make an identification.  (Tr. at 68; Lineup DD5, attached as Exh. 6 to Garber Decl., ¶ 1).  Though Detective Thompson's police report stated only that Mr. Ramos was unable to identify the suspect, Detective Thompson believed Mr. Ramos refused to make an identification.  (Tr. at 68, 70, 72-74, 294, 303-04).

Ms. Velazquez viewed the lineup after Mr. Ramos.  (Tr. at 68, 174).  She was driven to the precinct by Theresa Brana, the victim's sister.  (Tr. at 139-40, 219-20).  Several copies of the wanted poster were in the car, which Ms. Velazquez looked at briefly.  (Tr. at 18, 21, 219-20).  The posters displayed the same

photograph of the petitioner that Ms. Velazquez had picked out in the photo array. (Wanted Poster; Photographic Array, attached as Exh. 2 to Declaration of Matthew B. White dated March 6, 2017 ("White Decl.")). Ms. Velazquez quickly identified Mr. Jimenez when she arrived at the lineup. (Tr. at 51, 174-75, 235; Lineup DD5, ¶ 2). She later testified at trial that she was able to identify him based on her memory of the shooting rather than from viewing the wanted posters. (Tr. at 235-36).

C.   <u>Pretrial Hearing</u>

On September 12 and 19, 1994, prior to Mr. Jimenez's trial, the trial court held a hearing pursuant to <u>United States v. Wade</u>, 388 U.S. 218 (1967), to evaluate Ms. Velazquez's lineup identification. (Tr. at 1-2, 33). After hearing testimony from Ms. Brana and Detective Thompson, the court denied the petitioner's motion to suppress Ms. Velazquez's eyewitness identification testimony, finding that her identification at the lineup was not tainted by her viewing of the wanted poster. (Tr. at 78).

At the pretrial hearing, petitioner's defense counsel noted that he "had three alibi witnesses a long time ago" and was "attempting to get a hold of them." (Tr. at 87). Indeed, he had filed a Notice of Alibi on January 26, 1993, announcing his intent to call Raymond Rosario, one of Mr. Jimenez's friends, as a witness at trial. (Notice of Alibi dated Jan. 26, 1993 ("Notice of

8

Alibi"), attached as Exh. 14a to Garber Decl.). His notes indicate that he was also aware of other potential alibi witnesses and had considered calling several of Mr. Jimenez's friends as witnesses at trial, including Danny Hernandez. (Alibi Notes of Rudy Velez ("Alibi Notes"), attached as Exh. 14 to Garber Decl.).

D.  The Trial

The trial began on September 22, 1994, before Justice Joseph Fisch. (Tr. at 95). The prosecution called six witnesses: Ms. Brana; Officer John McAndrews, the first officer to arrive at the scene of the crime; Dr. Charles; Detective Thompson; Ms. Velazquez; and Mr. Ramos.

Ms. Velazquez testified that she had an unobstructed, close view of the perpetrator's face and unequivocally identified Mr. Jimenez as Mr. Brana's shooter. (Tr. at 169-71, 173-75, 178-79, 227-28). Mr. Ramos did not immediately identify Mr. Jimenez as the shooter. (Tr. at 254). He also testified that he did not recognize anyone at the October 15, 1992 lineup because he "did not remember too well." (Tr. at 255-57). Despite his initial failure to identify the petitioner in court, Mr. Ramos eventually admitted that Mr. Jimenez "look[ed] like" the shooter. (Tr. at 259). Finally, on re-direct, Mr. Ramos testified that he believed the shooter was Dominican because he knew him "for about a year or two," and he identified the petitioner as the shooter. (Tr. at

265).   On re-cross, Mr. Ramos affirmed that he "now [] s[aw] Monaguillo in the courtroom."  (Tr. at 265).

The defense called Detective Coor, who had interviewed Ms. Velazquez with Detective Thompson.  Detective Coor admitted that Ms. Velazquez's statement to the police had been taken by two detectives and that the reports may have contained errors.  (Tr. at 336-37, 341-42).  The defense also called Andrzej Jachimczyk, who had been Mr. Jimenez's probation officer in 1992, and who testified that he had never seen Mr. Jimenez with Jheri curls.  (Tr. at 363-64).

During deliberations, the jury requested a read-back of nearly all of the trial testimony and asked for a read-back of Mr. Ramos' testimony twice.   (Tr. at 468, 482).   After "a few hours" of deliberations, they informed the court that they were unable to reach a verdict, but the trial judge instructed them to continue deliberating.  (Tr. at 473-74).  On October 4, 1994, after two days of deliberations, the jury convicted Mr. Jimenez of murder in the second degree.   (Tr. at 485).   On October 24, 1994, he was sentenced to an indeterminate term of twenty-five years to life imprisonment.  (White Decl., ¶ 31).

E.   The Direct Appeal (1996) and Pro Se Motion (2001)

In June 1996, the petitioner appealed his conviction.  (Brief for Defendant-Appellant, People v. Jimenez, 232 A.D.2d 210, 647

N.Y.S.2d 947 (1st Dep't 1996) ("Appeal Brief"), attached as Exh. 6 to White Decl.). He asserted that (1) Ms. Velazquez's identification of him at the lineup was tainted by her viewing of the wanted posters, (2) the court's identification charge was inadequate, and (3) the sentence was excessive. (Appeal Brief at 14, 23, 28). On October 8, 1996, the Appellate Division, First Department, unanimously affirmed Mr. Jimenez's conviction. <u>People v. Jimenez</u>, 232 A.D.2d 210, 210, 647 N.Y.S.2d 947, 947 (1st Dep't 1996). The New York Court of Appeals denied leave to appeal on December 20, 1996. <u>People v. Jimenez</u>, 89 N.Y.2d 924, 924, 654 N.Y.S.2d 726 (table) (1996).

On July 26, 2001, Mr. Jimenez filed a <u>pro se</u> motion to vacate his conviction pursuant to New York Criminal Procedure Law ("CPL") § 440.10. (Affidavit of Raphael Jimenez, <u>People v. Jimenez</u>, Indictment No. 7631/92 (N.Y. Sup. Ct. July 7, 2001) ("<u>Pro Se</u> § 440 Motion"), attached as Exh. 8 to White Decl.). He asserted that (1) his right to legal counsel was violated because he was unrepresented at the October 15, 1992 lineup, (2) the jury verdict was coerced by the trial judge, (3) Ms. Velazquez's viewing of the wanted poster was prejudicial, (4) the victim's and arresting officer's testimony was "bolstering," (5) an independent source hearing on Ms. Velazquez's identification should have been held, and (6) his counsel was ineffective. (<u>Pro Se</u> § 440 Motion at 1, 3,

5, 10, 13).  On November 14, 2001, the court denied Mr. Jimenez's motion as procedurally barred.  (<u>People v. Jimenez</u>, Indictment No. 7631/92 (N.Y. Sup. Ct. Nov. 13, 2001), attached as Exh. 10 to White Decl.).  He did not appeal.

F.    <u>The 2014 CPL § 440.10 Motion</u>

On July 1, 2014, Mr. Jimenez filed another motion pursuant to CPL § 440.10 to vacate his conviction based on actual innocence, newly-discovered evidence, and violations of due process.  (Garber Decl., ¶ 28).  Mr. Ramos submitted an affidavit recanting his identification of Mr. Jimenez.[5]  He stated that during the murder, the shooter said, in Spanish, "[W]hat is it that you want, mamaguevo?"  (Translated Affidavit of Harry Ramos dated April 11, 2013 ("Ramos Aff."), attached as part of Exh. 10 to Garber Decl., ¶ 1).  Mr. Ramos stated that this slur, which means cocksucker, is a Dominican profanity and that the shooter was Dominican.  (Ramos Aff., ¶ 1).  Mr. Ramos asserted that in or about 2011, he learned that Mr. Jimenez is of Puerto Rican heritage and therefore no longer believes Mr. Jimenez is the shooter.  (Ramos Aff., ¶ 4).

_____

[5] The affidavit is in Spanish with an English translation attached to it.  While the translation is not certified and the dates on the documents are inconsistent, I will accept the translated version because the respondent has not challenged it. Additionally, the State court accepted the translation when the court's interpreter found no substantial errors.  <u>See</u> <u>People v. Jimenez</u>, 46 Misc. 3d 1220(A) (table), 9 N.Y.S.3d 594 (table), 2015 WL 770457, at *5 n.3 (N.Y. Sup. Ct. Feb. 13, 2015).

Additionally, Mr. Ramos claimed that the detectives misled him into believing both that Mr. Jimenez was Dominican and that he was the shooter. (Ramos Aff., ¶ 1).

The petitioner also filed an affidavit from Dr. Cecelia Cutler, Ph.D., a professor of Sociolinguistics, identifying studies that support Mr. Ramos' ability to distinguish between ethnicities based on dialect. (Affidavit of Dr. Cecelia Cutler dated June 25, 2014 ("Cutler Aff."), attached as Exh. 8 to Garber Decl., at 2). In addition, the petitioner submitted affidavits from two alibi witnesses, Amancio Delgado and Danny Hernandez, who claim that on the day of the murder, Mr. Jimenez was with them a mile from the murder until well into the evening. (Affidavit of Amancio Delgado dated Jan. 21, 2014, attached as Exh. 9 to Garber Decl. ("Delgado Aff."), ¶¶ 5-6; Affidavit of Danny Hernandez dated Dec. 10, 2013, attached as Exh. 13 to Garber Decl. ("Hernandez Aff."), ¶¶ 3-4).

On February 13, 2015, Justice Barbara Newman denied the motion. See Jimenez, 46 Misc. 3d 1220(A) (table), 9 N.Y.S.3d 594 (table), 2015 WL 770457, at *13. Justice Newman found that Mr. Ramos' affidavit was unreliable and contradicted by the trial record. Id., 9 N.Y.S.3d 594 (table), 2015 WL 770457, at *4-8. The court also found that the alibi affidavits of Mr. Delgado and Mr. Hernandez lacked credibility because they were vague and supplied by persons who had an interest in the case. Id., 9 N.Y.S.3d 594

(table), 2015 WL 770457, at *8-10.  The First Department denied

leave to appeal on November 5, 2015.  (Certificate Denying Leave,

People v. Jiminez, Index No. 7631/92 (1st Dep't filed Nov. 5,

2015), attached as Exh. 22 to Garber Decl.).

     G.   Habeas Corpus Petition

On November 4, 2016, Mr. Jimenez filed the instant petition

for a writ of habeas corpus, raising substantially the same issues

he asserted in the State collateral proceedings.  The respondent

argues, among other things, that the petition is time-barred.  In

response, Mr. Jimenez argues that the petition is timely, and that

he is otherwise entitled to an exception from the one-year

limitations period because he is actually innocent.

## Discussion

The AEDPA provides a remedy for a state prisoner when his

continued custody is in violation of federal law. 28 U.S.C §

2254(a).  The AEDPA imposes a one-year period of limitations for

its remedy, running from the latest of:

> (A)   the date on which the judgment became final by the
> conclusion of direct review or the expiration of
> the time for seeking such review;

> (B)   the date on which the impediment to filing an
> application created by State action in violation of
> the Constitution or laws of the United States is
> removed, if the applicant was prevented from filing
> by such State action;

> (C)   the date on which the constitutional right asserted

was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  However, the AEDPA limitations period can be equitably tolled in appropriate cases.  See Holland v. Florida, 560 U.S. 631, 645 (2010).  Similarly, a prisoner can circumvent the AEDPA limitations period if he makes "a credible showing of actual innocence."  McQuiggin v. Perkins, __ U.S. __, __, 133 S. Ct. 1924, 1931 (2013).

Mr. Jimenez's direct appeal was denied on December 20, 1996.  Jimenez, 89 N.Y.2d at 924, 654 N.Y.S.2d 726 (table).  The petition is therefore untimely under § 2244(d)(1)(A).  See Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001) (limitations period for state prisoner's habeas petition "begins to run only after . . . the expiration of time for seeking certiorari" from Supreme Court); Chrysler v. Guiney, 14 F. Supp. 3d 418, 433 (S.D.N.Y. 2014) (New York State court judgment becomes final ninety days after decision by New York Court of Appeals).  The petitioner argues that the petition is instead timely pursuant to § 2244(d)(1)(D).  Alternatively, he argues that any procedural default is excused because he is actually innocent.

15

A.   28 U.S.C. § 2244(d)(1)(D)

Section 2244(d)(1)(D) "resets the limitations period's beginning date, moving it from the time when the conviction became final . . . to the later date on which the particular claim accrued." Ocasio v. Lee, No. 14 Civ. 6097, 2017 WL 456468, at *3 (S.D.N.Y. Feb. 2, 2017) (alteration in original) (quoting Chettana v. Racette, No. 15 CV 28, 2016 WL 447716, at *5 (N.D.N.Y. Feb. 4, 2016)).   "The determination of the date on which the factual predicate for a habeas claim is first discoverable is a 'fact-specific' inquiry which requires a district court to analyze the factual bases of each claim and to determine when the facts underlying the claim were known, or could with due diligence have been discovered." Rivas v. Fischer, 687 F.3d 514, 534 (2d Cir. 2012).   To determine if facts could have been discovered through the exercise of due diligence, a court needs to evaluate "when a duly diligent person in [the] petitioner's circumstances would have discovered" those facts. Wims v. United States, 225 F.3d 186, 190 (2d Cir. 2000).   "Evidence is not newly discovered simply because a petitioner did not possess it until recently; if evidence could have been obtained earlier, 'the date when the evidence was actually obtained has no effect on the AEDPA limitations period.'" Bryant v. Thomas, __ F. Supp. 3d __, __, 2017 WL 3328241, at *9 (S.D.N.Y. 2017) (quoting Duamutef v. Mazzuca, No. 01 Civ. 2553,

2002 WL 413812, at *9 (S.D.N.Y. March 15, 2002)).

In his petition, Mr. Jimenez claims that newly discovered evidence warrants the grant of habeas relief. The alleged new evidence supporting this claim includes four affidavits, the latest of which was signed on June 25, 2014. Even assuming that the date of this affidavit represents the date on which the evidence was discovered, the plaintiff's application is still untimely. Six days after that affidavit was signed, the petitioner filed the CPL § 440.10 motion in State court, which tolled the limitations period. See 28 U.S.C. § 2244(d)(2); Hizbullahankhamon v. Walker, 255 F.3d 65, 70 (2d Cir. 2001). The statute remained tolled for 499 days until November 5, 2015, when the Appellate Division denied leave to appeal. See Barrientos v. Lee, No. 14 Civ. 3207, 2015 WL 3767238, at *8 (S.D.N.Y. June 17, 2015). From that date, another 365 days passed[6] before the petitioner filed the instant petition on November 4, 2016. Thus, the petitioner waited a total of 371 days to file his habeas petition. Accordingly, the petition is untimely.[7]

_____

[6] 2016 was a leap year; thus, Mr. Jimenez had one additional day -- a total of 366 days -- to file his petition. See, e.g., Harper v. Ercole, 648 F.3d 132, 134 n.1 (2d Cir. 2011); United States v. Marcello, 212 F.3d 1005, 1010 (7th Cir. 2000); Lopez v. Superintendent of New York State -- NYS Oneida County, No. 12 CV 3789, 2013 WL 5445986, at *4 n.2 (E.D.N.Y. Sept. 27, 2013).

[7] The petitioner's argument that "the calculation should commence [on] the date the denial of a state motion becomes final"

B.  Gateway Actual Innocence

The petitioner argues that any procedural default should be excused because he is actually innocent.  "[H]abeas corpus is, at its core, an equitable remedy." Schlup v. Delo, 513 U.S. 298, 319 (1995).  Accordingly, "in appropriate cases," the principles of comity and finality underlying procedural bars on habeas review "must yield to the imperative of correcting a fundamentally unjust incarceration." Engle v. Isaac, 456 U.S. 107, 135 (1982).

The Supreme Court has applied the "gateway" actual innocence exception to a number of procedural bars, including the bar imposed by the AEDPA's one-year statute of limitations. McQuiggin, __ U.S. at __, 133 S. Ct. at 1928; Rivas, 687 F.3d at 517.  Such exceptions are, however, "rare" and will apply only "in the extraordinary case." Schlup, 513 U.S. at 321.  To excuse a petitioner from a procedural default, "a claim of actual innocence must be both 'credible' and 'compelling.'" Rivas, 687 F.3d at 541.  This establishes a two-pronged test.

First, the petitioner must establish that the claim is

_____

(Petitioner's Reply Memorandum of Law at 3) is unconvincing, see, e.g., Bethea v. Girdich, 293 F.3d 577, 578 (2d Cir. 2002) ("[S]tate-court applications for collateral relief do not 'restart' the AEDPA limitations period . . . ."); Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000) ("If the one-year period began anew when the state court denied collateral relief, then state prisoners could extend or manipulate the deadline for federal habeas review by filing additional petitions in state court.").

credible.  For the claim to be credible, it must be supported with "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts or critical physical evidence -- that was not presented at trial."  House v. Bell, 547 U.S. 518, 537 (2006) (quoting Schlup, 513 U.S. at 324).  New evidence is "all evidence that was not presented to the jury during trial."[8]  Lopez, 915 F. Supp. 2d at 400 n.16; see Schlup, 513 U.S. at 324; Rivas, 687 F.3d at 543.  "Evidence supporting an actual innocence claim need not fit within one of the categories explicitly listed in Schlup so long as the court determines it to be 'new reliable evidence.'"  Lopez, 915 F. Supp. 2d at 399 n.14 (emphasis omitted).  The court must determine "whether the new evidence is trustworthy by considering it on its own merits and, where appropriate, in light of the pre-existing evidence in the record."  Doe v. Menefee, 391 F.3d 147, 161 (2d Cir. 2004).  In considering the reliability of evidence for actual innocence purposes, the court "is not bound by the rules of admissibility that would govern at trial."  Schlup, 513 U.S. at 327.  That is, it

---

[8] Some circuit courts have held that for evidence to be new, it must also not have been available at trial.  See Lopez v. Miller, 915 F. Supp. 2d 373, 400 n.16 (E.D.N.Y. 2013) (collecting cases).  However, Rivas defined new evidence only as "evidence not heard by the jury."  687 F.3d at 543 ("What makes the claim 'credible,' as Schlup defines that term, is that it is based on new evidence -- that is, evidence not heard by the jury . . . .").  I will therefore apply that definition.

may "consider the probative force of relevant evidence that was either excluded or unavailable at trial." Id. at 327-28. The court may assess the credibility of a new witness by considering "the potential motives to be untruthful that the witness may possess, corroboration or lack thereof, internal consistency, and the inferences or presumptions that crediting particular testimony would require." Doe, 391 F.3d at 164-65. Additionally, "[u]nexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." McQuiggin, __ U.S. at __, 133 S. Ct. at 1935.

Second, the petitioner must establish that the claim is compelling. "As long as the petitioner has presented 'some new reliable evidence,' the court may proceed to the 'compelling' prong of the claim, at which point the court's analysis 'is not limited to [new reliable] evidence' but must be based on 'all the evidence, old and new.'" Lopez, 915 F. Supp. 2d at 399 (alteration in original) (quoting House, 547 U.S. at 537) (emphases added); see also Rivas, 687 F.3d at 542. For a claim to be compelling, the petitioner must demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt -- or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." Rivas, 687 F.3d at 541 (quoting House, 547 U.S. at 538). "[T]he

inquiry requires a federal court to assess how reasonable jurors would react to the overall, newly supplemented record," which may "include consideration of the credibility of the witnesses to be presented at trial." Id. (quoting House, 547 U.S. at 538–39). "It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." Schlup, 513 U.S. at 329. This standard "focuses the inquiry on the likely behavior of the trier of fact." Id. at 330. "[I]t may be enough for the petitioner to introduce credible new evidence that thoroughly undermines the evidence supporting the jury's verdict." Rivas, 687 F.3d at 543.

1.    Effect of the 2014 CPL § 440.10 Proceeding

The respondent argues that 28 U.S.C. § 2254(e)(1) applies to the petitioner's gateway actual innocence claim. Section 2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

While neither the Supreme Court nor the Second Circuit have held that this presumption applies to gateway actual innocence claims,

several other circuits have concluded that it does.  See <u>Reed v.</u>
<u>Stephens</u>, 739 F.3d 753, 772 n.8 (5th Cir. 2014); <u>Carr v. Warden,</u>
<u>Lebanon Correctional Institution</u>, 401 F. App'x 34, 38–39 (6th Cir.
2010); <u>Sharpe v. Bell</u>, 593 F.3d 372, 379 (4th Cir. 2010); <u>Storey v.</u>
<u>Roper</u>, 603 F.3d 507, 524 (8th Cir. 2010); <u>Love v. Roberts</u>, 259 F.
App'x 58, 63 (10th Cir. 2007); <u>Goldblum v. Klem</u>, 510 F.3d 204, 221
n.13 (3d Cir. 2007).  Other courts in this district have also
applied the rule to gateway actual innocence claims.  See <u>Bryant</u>,
__ F. Supp. 3d at __, 2017 WL 3328241, at *12 ("[T]he state court
observed that the New York Court of Appeals had already sustained
an earlier finding that Petitioner voluntarily agreed to accompany
the police to the police station and that Petitioner's confession
was not the product of coercion; these are findings of fact
entitled to deference under Section 2254(e)(1).").

While I am not bound by these decisions, I find them
persuasive, and it is clear from the plain text of the rule that a
state court's factual determinations are presumed correct in all
federal habeas corpus proceedings.  See 28 U.S.C. § 2254(e)(1).
Therefore, I will presume those determinations are correct absent
a contrary showing by clear and convincing evidence.  See <u>Richards</u>
<u>v. Quarterman</u>, 566 F.3d 553, 563 (5th Cir. 2009); <u>see also</u>
<u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003) ("A federal court
can disagree with a state court's credibility determination and,

22

when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.").

## 2. Federal Habeas Evidence

Mr. Jimenez has resubmitted the affidavits he filed in connection with his 2014 CPL § 440.10 motion in this proceeding. Mr. Ramos, who witnessed the shooting, recounts the murder and clarifies a detail of his original testimony. Mr. Ramos testified at the trial that before shooting Mr. Brana, the shooter said, in Spanish, "What is it that you want, cocksucker?" (Tr. at 258, 264). Mr. Ramos' affidavit now states that the shooter used the Dominican version of the profanity, "mamaguevo," which is distinct from the Puerto Rican version, "cabron." (Ramos Aff., ¶ 2). According to Mr. Ramos, he formed his belief that the shooter was Dominican based on his use of the word "mamaguevo."[9] (Ramos Aff., ¶¶ 1-2). However, in or around 2011, Mr. Ramos learned Mr. Jimenez's actual ethnicity. Mr. Jimenez's sister was a tenant in the building in which Mr. Ramos worked as a superintendent. One day, by chance, Mr. Ramos' wife and Mr. Jimenez's sister were

_____

[9] Mr. Ramos testified in Spanish at trial; his testimony was translated to English for the court and the jury. The transcript reflects the English translation of Mr. Ramos' testimony, such that it is impossible to determine which version of the profanity Mr. Ramos used during his testimony. (Tr. at 254, 258, 264).

discussing the murder and Mr. Jimenez's sister revealed that it was her brother who was convicted for the murder. (Ramos Aff., ¶ 6). Upon learning that Mr. Jimenez is of Puerto Rican heritage, Mr. Ramos claims that he is "completely certain" that Mr. Jimenez is innocent. (Ramos Aff., ¶¶ 6-7).

Mr. Ramos further states that when he went to the police precinct after the shooting to observe a lineup, the shooter "wasn't there." (Ramos Aff., ¶ 2). Mr. Ramos asserts that the detective told him "that [the shooter] was there" and said that Ms. Velazquez had picked out the shooter, but Mr. Ramos ultimately did not pick anyone from the lineup. (Ramos Aff., ¶ 2).

He asserts that, before he was called to testify, he was brought to a room and shown a picture of Mr. Jimenez. (Ramos Aff., ¶ 4). He alleges that he was still uncertain about whether Mr. Jimenez was Mr. Brana's shooter at that time, so he asked the detective whether Mr. Jimenez was Dominican or Puerto Rican. (Ramos Aff., ¶ 4). Mr. Ramos alleges that the detective told him that Mr. Jimenez was Dominican and that, based on this representation, he identified Mr. Jimenez in court as the shooter. (Ramos Aff., ¶¶ 4-5).

The petitioner also filed an affidavit signed by Dr. Cecelia Cutler, Ph.D. in Sociolinguistics, to highlight the dialect differences between Dominican and Puerto Rican Spanish speakers and

identify studies that support Mr. Ramos' ability to distinguish between ethnicities based on dialect. (Cutler Aff.).

Mr. Jimenez further relies on the affidavits of two alibi witnesses, Amancio Delgado and Danny Hernandez, who were friends of his in 1992. These affidavits claim that on the day of the murder, Mr. Jimenez was with them and several other friends celebrating Mr. Hernandez's eighteenth birthday at the corner of Mt. Eden Avenue and Townsend Avenue, approximately one mile from the scene of the crime. (Delgado Aff., ¶¶ 5-6; Hernandez Aff., ¶¶ 3-4). Both Mr. Delgado and Mr. Hernandez assert that Mr. Jimenez was with them from about 11:00 a.m. to 10:00 p.m. (Delgado Aff., ¶ 5; Hernandez Aff., ¶ 4). Mr. Delgado's affidavit also asserts that he himself is of Dominican heritage, that he is familiar with the Dominican word "mamaguevo," and that it is a word "that only Dominicans would say, and it's not a word that [Mr. Jimenez] would be expected to say, and I've never heard him say it." (Delgado Aff., ¶ 9).

On June 26 and 29, 2017, I held an evidentiary hearing limited to the issue of Mr. Jimenez's gateway actual innocence claim. (H. at 1, 261).[10] Mr. Ramos, Dr. Cutler, Mr. Hernandez, Mr. Delgado, Detective Thompson, and Mr. Jimenez testified at the hearing. I also viewed a videotaped version of Mr. Ramos' recantation

_____

[10] "H." refers to the transcript of the evidentiary hearing.

statement and the video interview of Mr. Jimenez upon his arrest in 1992. Shortly after the hearing, I received an Evidentiary Stipulation from the parties, which disclosed that the Assistant District Attorney at trial had a folder in his case file labeled "Alibi," containing information for Leo Gonzalez, another of Mr. Jimenez's friends. (Evidentiary Stipulation ("Stipulation"), ¶ 1).

All of this evidence, along with the affidavits described above, is "new" for actual innocence purposes because it was not presented at trial. See Rivas, 687 F.3d at 543 ("new evidence" is "evidence not heard by the jury"). The question before me at this stage is thus whether it is "reliable" under the credibility prong.

### 3. Credibility Prong

#### a. Amancio Delgado and Danny Hernandez

Mr. Delgado and Mr. Hernandez submitted affidavits and testified at the evidentiary hearing in support of Mr. Jimenez's alibi. They also submitted their affidavits to the State court, and that court found them unreliable because the affidavits: (1) described no specific activities supporting their memory of that day; (2) placed the petitioner within only one mile of the murder; (3) failed to show the petitioner remained at Mt. Eden and Townsend throughout the relevant period; (4) corroborated Ms. Velazquez's testimony because the petitioner was in a group of males, one of whom was Dominican; (5) established that the petitioner had a

Dominican friend and must therefore know Dominican profanities; and (6) were submitted by the petitioner's friends. <u>Jimenez</u>, 46 Misc. 3d 1220(A) (table), 9 N.Y.S.3d 594 (table), 2015 WL 770457, at *8-9. The State court also found that the witnesses must not have been credible because defense counsel did not call them at trial. <u>Id.</u>, 9 N.Y.S.3d 594 (table), 2015 WL 770457, at *9.

I find that there is clear and convincing rebutting the State court's credibility determination. Although the shooting occurred approximately twenty-two years before the signing of the affidavits and twenty-five years before the testimony at the evidentiary hearing, the statements are detailed and do not show that the witnesses misremembered the events of the day of the shooting. Mr. Delgado and Mr. Hernandez state that they had clear memories of that day because it was Mr. Hernandez's eighteenth birthday. (H. at 217; Delgado Aff., ¶ 6). Both recollect who attended, though their memories do not precisely align on that point. (H. at 161-62, 217, 246; Delgado Aff., ¶ 5; Hernandez Aff., ¶ 3). Nevertheless, each witness remembers when he arrived, where the party was, and what stores and buildings were near the street corner. (H. at 216-18, 239; Delgado Aff., ¶ 5). They both remember what they did, including drinking, smoking marijuana, listening to music, eating, and playing dominoes until late in the evening. (H. at 166, 187-88, 191, 217-18, 241-43; Delgado Aff.,

¶ 5; Hernandez Aff., ¶ 4).  Mr. Hernandez admits that Mr. Jimenez was not continuously in his line of sight (H. at 188-90, 206), but that he was not gone long enough to go to the scene of the murder and return.  (H. at 206).  He also stated that Mr. Jimenez never looked agitated that day.  (H. at 206-207).  Mr. Delgado stated that Mr. Jimenez never left his line of sight.  (H. at 246).

The testimony of each alibi witness is thus detailed and largely consistent with that of the other.  Cf. United States v. Leppert, 408 F.3d 1039, 1042 (8th Cir. 2005) ("cross-corroboration" of statements supported their reliability); McGahee v. United States, 570 F. Supp. 2d 723, 736 (E.D. Pa. 2008) (minor contradictions were immaterial given that the alibi statements were "basically consistent").  Moreover, once Mr. Jimenez was arrested and the group of friends realized that the shooting occurred on Danny Hernandez's birthday, these witnesses expected that they would need to remember their interactions with Mr. Jimenez from that day.  (H. at 219, 252 (Mr. Delgado explains what he did when he realized date of crime was Mr. Hernandez's birthday); H. at 221 (Mr. Delgado explains why details have stayed with him); H. at 200-02 (Mr. Hernandez states that they went to trial lawyer when they realized murder occurred on his birthday); Delgado Aff., ¶ 8 (Mr. Delgado states that he discussed being alibi witness with Mr. Jimenez's lawyer but was never called to testify); Hernandez Aff.,

28

¶ 5 (Mr. Hernandez states that he offered to testify on Mr. Jimenez's behalf)). The notes of Mr. Jimenez's trial counsel also indicate that Mr. Hernandez was a potential alibi witness. (Alibi Notes). The witnesses' willingness to testify at the trial -- as asserted by them and supported by documentation -- at the very least suggests that they would have repeated the contents of their affidavits at the trial had they been called by Mr. Jimenez's counsel. (H. at 169, 251).

The respondent argues that because Mr. Delgado and Mr. Hernandez were friends of Mr. Jimenez, they have a personal interest in the outcome of the case and thus their alibi statements are unreliable. The respondent has presented no evidence that Mr. Delgado and Mr. Hernandez are biased other than the fact that were once friends with Mr. Jimenez, and that relationship alone does not undermine their reliability. See Poindexter v. Booker, 301 F. App'x 522, 529 (6th Cir. 2008) (holding that district court erred in finding alibi witnesses not credible based on close relationships with defendant because "alibi witnesses often have close relationships with the defendant"); Bell v. Howes, 757 F. Supp. 2d 720, 737 (E.D. Mich. 2010) ("[I]t is the nature of alibi witnesses that they typically have some sort of relationship with the defendant."), vacated and remanded on other grounds by 703 F.3d 848 (6th Cir. 2012); McGahee, 570 F. Supp. 2d at 736 (long-time

friends of petitioner were not inherently unreliable alibi witnesses, especially where their testimony was "basically consistent"); Bohan v. Kuhlmann, 234 F. Supp. 2d 231, 281 (S.D.N.Y. 2002) (noting that friendship with petitioner does not make alibi witness' testimony intrinsically dishonest or untrustworthy; rather "the degree to which [the witness'] interest affects his credibility" is a question of fact).

Moreover, at the time they began correspondence with the petitioner's current counsel and submitted their affidavits, Mr. Delgado and Mr. Hernandez no longer had any relationship with Mr. Jimenez. After his conviction, Mr. Jimenez's relationship with his friends ended. Mr. Hernandez testified that he lost all contact with Mr. Jimenez approximately a year after his arrest, and his affidavit affirms that he never saw or spoke to Mr. Jimenez after his conviction. (H. at 169; Hernandez Aff., ¶ 7). Mr. Delgado likewise testified that he mostly lost contact with Mr. Jimenez about a year after his conviction (H. at 220-21, 253-54), and his affidavit explicitly states that he had not had "any contact with [Mr. Jimenez] in over 5 years"[11] (Delgado Aff., ¶ 11). However, Mr. Jimenez sent him a few letters during that time, and Mr. Delgado

---

[11] Mr. Delgado admits, however, that he has rekindled his friendship with Mr. Jimenez since he signed his affidavit in January 2014. (H. at 221, 254).

sent him about $95 between 2003 and 2004. (H. at 254).
Additionally, after Mr. Delgado signed his affidavit, he sent Mr.
Jimenez $675 in February 2017 composed of contributions from a
group of friends. (H. at 254-57). However, these monetary gifts
were occasional, and the large sum came after Mr. Delgado signed
the affidavit. Thus, I do not find that the alibi witnesses were
significantly affected by their relationship with the petitioner.
See Lopez, 915 F. Supp. 2d at 402 (finding that alibi witnesses who
had lost contact with petitioner were reliable and unlikely to
commit perjury); cf. Hope v. Cartledge, 857 F.3d 518, 525 n.4 (4th
Cir. 2017) (suggesting that alibi testimony from witness who has
severed his relationship with petitioner is more reliable than
testimony from witness who has continued relationship).

The respondent argues that the witnesses' accounts of what
they did with Mr. Jimenez on June 25, 1992, are too vague and
implausible to warrant belief. However, their statements about
what they did that day -- that in celebration of Mr. Hernandez's
eighteenth birthday, beginning around 11:00 a.m. or noon until
around 10:00 p.m., they drank beer, smoked marijuana, and played
dominoes at their normal hangout spot at the corner of Mt. Eden and
Townsend Avenue with their normal group of friends -- are generally
internally consistent and consistent with each other's statements.
Respondent has provided no reason why those activities would be

31

implausible. Additionally, I find that the reason that the witnesses remembered what happened that day is compelling. As Mr. Delgado testified, the alibi witnesses were made aware that Mr. Jimenez was arrested for murder three or four months after Mr. Hernandez's birthday. At that time, they had a fresher memory of that day and would have reason to retain their memories of that day going forward. As Mr. Delgado testified, the memory of what happened "never left [his] mind to this day." (H. at 221).

The respondent points out that neither Mr. Delgado nor Mr. Hernandez explains why it took him nearly twenty-two years after the crime to come forward with information supporting an alibi. Relatedly, the respondent argues that the failure to alert authorities to the existence of the alibi undermines the reliability of their statements. To the extent that this argument attempts to imply that the alibi is a recent fabrication, this contention is plainly contradicted by the record. Mr. Delgado and Mr. Hernandez tried to present the alibi by informing Mr. Jimenez's trial counsel -- an undeniably proper course of action -- and were willing to testify on Mr. Jimenez's behalf. (H. at 169, 251; Delgado Aff., ¶ 7; Hernandez Aff., ¶ 5; Alibi Notes). Though it was never presented to the court, it is uncontested that some alibi evidence existed at the time of trial. (Alibi Notes; Notice of Alibi; Tr. at 87; Stipulation, ¶ 1). Additionally, the prosecutor

was apparently aware of the alibi, since his trial folder contained an "Alibi" file with the name Leo Gonzalez, one of Mr. Jimenez's friends.  (Stipulation, ¶ 1).

Mr. Delgado's and Mr. Hernandez's failure to go directly to the authorities after Mr. Jimenez's conviction does not undermine the reliability of their statements.  Mr. Delgado testified that Mr. Gonzalez was the person who was initially in contact with Mr. Jimenez's trial attorney about the alibi and that Mr. Delgado only personally spoke to the trial attorney after the trial attorney asked Mr. Gonzalez to "bring he and Mr. Hernandez in" to discuss being alibi witnesses, which was about a year and a half after Mr. Jimenez was arrested.  (H. at 251-52).  Since Mr. Gonzalez was the initial liaison regarding the alibi, Mr. Delgado and Mr. Hernandez could have reasonably inferred that going directly to the authorities would have no additional impact on the case against Mr. Jimenez.  I do not find the respondent's argument here persuasive. See Lopez, 915 F. Supp. 2d at 402 ("[T]he passage of time alone does not convince the court to reject the alibi witnesses' testimony."); Cleveland v. Bradshaw, 693 F.3d 626, 641 (6th Cir. 2012) ("[T]he passage of time is [not] sufficient in and of itself to render [an alibi] affidavit unreliable."); McGahee, 570 F. Supp. 2d at 736 (failure to provide "[an] explanation for why they allowed their friend to sit in jail for years, without contacting

his lawyer or the Government to say that Petitioner could not have committed the crime" did not automatically render alibi incredible).

Insofar as the respondent's implication is that the witnesses manufactured the alibi at the time of trial and that the witnesses are still untruthful, the respondent has not presented any evidence to support this allegation. Mr. Delgado and Mr. Hernandez are only former friends. Indeed, both would have much to lose by committing perjury. Both have children they support financially. (H. at 160, 209-10). Both have steady jobs -- Mr. Hernandez worked in the construction industry for over five years; Mr. Delgado has worked for the Metropolitan Transportation Authority for over five years and was recently promoted to a supervisor. (H. at 159, 209). Both are pursuing college degrees: Mr. Hernandez at Newman College and Mr. Delgado at Columbia University. (H. at 159, 209); see, e.g., Bohan, 234 F. Supp. 2d at 281 (factors that lend credibility to friend's alibi testimony include college attendance and holding steady job). Based on all of these considerations, I do not find that they would revive a false alibi in order to exonerate a former friend, especially one whom they have hardly spoken to in over twenty years.

Finally, I find that defense counsel's failure to call the alibi witnesses at trial shows little about their credibility. The

State court's conclusion in this respect is speculative, as trial counsel never testified or even submitted an affidavit in the State proceeding. There is nothing in the record suggesting that they would have been unreliable witnesses at trial. It is plausible that they were not called because defense counsel was unable to reach them, or that the lawyer was incompetent.

For these reasons, the sworn statements of Mr. Delgado and Mr. Hernandez constitute "new reliable evidence" supporting Mr. Jimenez's actual innocence claim. See Schlup, 513 U.S. at 331 (sworn statements of two people "that cast[ed] doubt on whether [petitioner] could have participated in the murder" in light of his whereabouts around time of crime would support petitioner's actual innocence claim if found to be reliable); see also Lopez, 915 F. Supp. 2d at 403 (affidavits of two alibi witnesses "constitute 'new reliable evidence'" sufficient to satisfy credibility prong). Although finding their statements credible is sufficient to proceed to the "compelling" prong of the gateway actual innocence analysis, see House, 547 U.S. at 537 (requiring only "some new reliable evidence" (emphasis added)), I will consider Mr. Ramos' testimony as well.

### b. Harry Ramos

"It is axiomatic that witness recantations 'must be looked upon with the utmost suspicion.'" Haouari v. Unites States, 510

F.3d 350, 353 (2d Cir. 2007) (quoting <u>Ortega v. Duncan</u>, 333 F.3d 102, 107 (2d Cir. 2003)).  Such evidence must not, however, simply be dismissed out of hand.  <u>See</u> <u>Schlup</u>, 513 U.S. at 328 (court must evaluate gateway actual innocence claim "in light of all the evidence . . . (but with due regard to any unreliability of it)" (quoting Henry J. Friendly, <u>Is Innocence Irrelevant? Collateral Attacks on Criminal Judgments</u>, 38 U. Chi. L. Rev. 142, 160 (1970))); <u>Fairman v. Anderson</u>, 188 F.3d 635, 646 (5th Cir. 1999) (although person's "status as a recanting witness detracts from the credibility of [the witness'] new testimony, it is not a bar to the acceptance of such testimony" (citation omitted)); <u>see also</u> <u>Cleveland</u>, 693 F.3d at 638-40 (finding recantation reliable).  As with any witness testimony, "the court evaluates recanted testimony 'in light of the substance of other evidence, considering the potential motives to be untruthful that the witness may possess, corroboration or the lack thereof, internal consistency, and the inferences or assumptions that crediting particular testimony would require.'" <u>Castillo v. Ercole</u>, No. 07 Civ. 11256, 2009 WL 1492182, at *6 (S.D.N.Y. May 27, 2009) (quoting <u>Doe</u>, 391 F.3d at 164-65).

The State court found that Mr. Ramos' recantation not credible because: (1) Mr. Ramos testified at trial that he knew the shooter for a few years; (2) Detective Thompson, at trial, testified that Mr. Ramos picked the petitioner's photograph from hundreds of

pictures and provided the initial lead; (3) Mr. Ramos appeared to be fearful, not coerced; (4) Mr. Ramos made an unequivocal identification in court; and (5) it was not implausible that Mr. Ramos would mistake a person of Puerto Rican descent for a person of Dominican descent. <u>Jimenez</u>, 46 Misc. 3d 1220(A) (table), 9 N.Y.S.3d 594 (table), 2015 WL 770457, at *5-7.

I find that there is clear and convincing evidence to overcome the State court's findings. Overall, the crux of Mr. Ramos' recantation -- that Mr. Jimenez was not the shooter because Mr. Jimenez is not Dominican -- is consistent among his affidavit, deposition testimony, and testimony at the evidentiary hearing: Mr. Ramos strongly believed the shooter was Dominican; he identified Mr. Jimenez despite his uncertainty because he believed he was Dominican; and he now knows Mr. Jimenez is innocent after learning he is of Puerto Rican heritage. Additionally, Mr. Ramos was more insistent at the evidentiary hearing than he was at the trial: at trial, he had great difficulty with making a courtroom identification. At the evidentiary hearing, he was certain that Mr. Jimenez was not the shooter. (H. at 24-26, 95). I do not doubt the sincerity of Mr. Ramos' belief that he identified the wrong man at trial.

I also find that Mr. Ramos had ample reason to believe that the shooter was Dominican and was able to differentiate between

Dominicans and Puerto Ricans.  First, he heard the shooter use a Dominican slur and speak with a Dominican accent.  Second, he believed the shooter to be "Monaguillo," a person he had known for a year or two and knew to be Dominican.  Third, Mr. Ramos testified credibly about his ability to differentiate between Dominican Spanish speakers and Puerto Rican Spanish speakers.  (H. at 18-20, 26).

Dr. Cutler's affidavit and testimony provide support, albeit weak, for the misidentification theory.  The studies that she cites support Mr. Ramos' ability to distinguish between Dominican Spanish speakers and Puerto Rican Spanish speakers when hearing only eight to forty-five seconds of speech, based on dialect alone.  (Cutler Aff. at 2).  There are nevertheless reasons to question the force of Dr. Cutler's testimony.  First, she rendered her opinion on the basis of Mr. Ramos' affidavit alone, specifically on his recollection of what the shooter said.  (H. at 126).  It is unclear whether Mr. Ramos' affidavit even purports to be an exact recitation.  In addition, while Mr. Ramos is a Puerto Rican native, Mr. Jimenez was born in New York, which Dr. Cutler admits could affect how he speaks Spanish.  (H. at 109).  Finally, she relies on studies that differentiate between Dominican and Puerto Rican Spanish speakers based on dialect, which includes pronunciation, intonation, the length of syllables, and other simple linguistic

cues.  (Cutler Aff. at 2-3; H. at 118).  Yet Mr. Ramos' affidavit implies that his identification of the shooter's Dominican ethnicity relies solely on the shooter's use of the word "mamaguevo."  (Ramos Aff., ¶ 2).  His affidavit makes no mention of accent, dialect, or pronunciation.  It was not until the evidentiary hearing that Mr. Ramos asserted that the shooter spoke with a Dominican accent.  (H. at 19).  Nevertheless, when asked why he was certain that the shooter was Dominican, Mr. Ramos responded, "Because, mamaguevo[.]"  (H. at 95).  Indeed, Dr. Cutler does not preclude the possibility that Mr. Ramos was mistaken in his identification of the shooter as Dominican based on his speech. (H. at 149-50).

The respondent argues that Mr. Ramos initially hesitated to identify Mr. Jimenez not because he was uncertain, but because he was afraid, which explains why he only identified Mr. Jimenez after he was reassured that no one would hurt him.  At the evidentiary hearing, however, Mr. Ramos clarified that he was afraid of certain Dominicans, and "Monaguillo," not Mr. Jimenez.  (H. at 68, 75, 94). Mr. Ramos also maintained that he eventually identified Mr. Jimenez because of the pressure he felt and because the prosecutor promised that Mr. Ramos would be relocated.  (H. at 23, 68, 71-73, 79).  It is worth noting that there is evidence in the record corroborating this allegation.  The prosecutor stated on the record at trial that

he had agreed to help Mr. Ramos and his family move out of the area. (Tr. at 249). Thus, his fear of the shooter in tandem with the promise of the prosecutor could have resulted in Mr. Ramos feeling pressure to make an identification, despite any uncertainty he felt about whether Mr. Jimenez was actually the perpetrator. Even if it is true that Mr. Ramos was afraid to identify Mr. Jimenez because at the time he thought he was the shooter, that is not a sufficient basis for discrediting his subsequent recantation entirely, since the recantation is predicated on his more recent discovery that Mr. Jimenez is of Puerto Rican heritage.

The respondent suggests that the recantation is unreliable because the circumstances giving rise to Mr. Ramos' newfound knowledge that Mr. Jimenez is of Puerto Rican heritage are suspicious. While it is certainly coincidental that Mr. Ramos learned of Mr. Jimenez's ethnicity from Mr. Jimenez's sister, it is not inconceivable that this occurred. Indeed, Mr. Ramos has been insistent that this interaction occurred (Ramos Aff., ¶ 6; H. at 23-25, 39, 82-84), and it provides a logical explanation for how he came to believe that Mr. Jimenez is innocent. The respondent also suggests that, as a friend of Mr. Jimenez's sister, Mr. Ramos is biased and is recanting in order to help her. However, evidence of Mr. Ramos' friendship with Mr. Jimenez's sister is insubstantial and the respondent has not provided a reason why Mr. Ramos would

perjure himself on her behalf; their friendship therefore does not convince me to reject his testimony.

Finally, the respondent argues that Mr. Ramos' unreliability is shown by his convictions for his use and sale of marijuana -- both at the time of trial and when he signed his affidavit. I find this evidence to be of little, if any, probative value for determining Mr. Ramos' character for truthfulness, particularly because the convictions do not demonstrate a propensity to lie. (H. at 11); see Lopez, 915 F. Supp. 2d at 406 (finding convictions for sale of crack and use of crack and heroin "to be of little if any probative value for determining [the witness'] character for truthfulness"); Eagan v. LaPlace Towing, Inc., No. 91-CV-4623, 1993 WL 121237, at *4 (E.D. La. April 14, 1993) ("[P]ossession of an illegal substance is hardly probative of truthfulness or untruthfulness." (internal quotation marks omitted)).

For these reasons, Mr. Ramos' recantation statements are reliable for establishing the limited propositions that he has provided multiple inconsistent accounts of what precisely he saw on the day of the shooting, that he has always believed the shooter was Dominican, and that he is now convinced Mr. Jimenez is not the shooter.

### 4. Compelling Prong

I conclude that, based on the evidence presented to date, any

41

reasonable juror would have reasonable doubt as to Mr. Jimenez's guilt. I draw this conclusion based on: (1) the weakness of the prosecution's case at trial; (2) the alibi witnesses' testimony; (3) the new evidence undermining Mr. Ramos' testimony; and (4) Mr. Jimenez's testimony.

a. <u>Weakness of the Prosecution's Evidence</u>

The prosecution's evidence at trial was particular weak. There was no physical or forensic evidence linking Mr. Jimenez to the crime; the case rested solely on eyewitness testimony. <u>Cf.</u> <u>Batten v. Greiner</u>, No. 97 CV 2378, 2003 WL 22284187, at *8 (E.D.N.Y. Aug. 26, 2003) (suggesting that case relying solely on eyewitness testimony with no physical evidence linking defendant to crime is weak case). The first witness, Ms. Velazquez, testified that she was there alongside her husband, Mr. Brana, when he was shot. (Tr. at 167-69). She testified that she had a clear, unobstructed view of the shooter from a distance of about eleven feet for at least thirty seconds. (Tr. at 169-71). However, her description of the shooter at trial is not wholly consistent with the description she gave to the detectives who took her statement following the shooting. Ms. Velazquez insisted at trial that the shooter was twenty-five to twenty-six years old, five fee six inches tall, Dominican, with long black Jheri curls, olive-colored skin, and khaki shorts. (Tr. at 172-73, 177, 212-13, 232-34). She

also testified that the shooter held the gun in his right hand. (Tr. at 168). The other description she provided was that of a male Dominican, age twenty-three to twenty-four, with long black Jheri curls, wearing a white tank top and denim shorts, and driving a red sports car. (Tr. at 190; Velazquez DD5). Most importantly, Mr. Jimenez matched neither description: he was seventeen years old at the time of the shooting, had short, close-cropped hair, is left-handed, of Puerto Rican heritage, and did not have a car or a drivers' license. (Tr. at 296, 301, 362-66; H. at 167-68, 272, 286-87).

Despite these inconsistencies, Ms. Velazquez identified Mr. Jimenez as the shooter several times without ever abandoning her original descriptions. (Tr. at 170-73, 181-82, 191; Velazquez DD5). In summation, Mr. Jimenez's defense counsel noted that her multiple descriptions and confusing testimony seemed to indicate that she was "not positive about the identity of the shooter." (Tr. at 398). Even the prosecutor in his closing statement twice agreed that "[s]he is not the best witness in the world." (Tr. at 411).

The only other eyewitness, Harry Ramos, never provided a description of the shooter at trial other than his neighborhood nickname, "Monaguillo." (Tr. at 254, 263-65). There was no evidence presented at trial that Mr. Jimenez ever went by that

nickname. In addition, Mr. Ramos equivocated in his identification of Mr. Jimenez several times both prior to and during the trial even though he claimed that he "knew" the shooter. (Tr. at 254-57).

In short, the testimony of the two eyewitnesses presented by the prosecution had serious defects. Ms. Velazquez, who had a clear view and gave a detailed description of the shooter, described a person very different from Mr. Jimenez. Nevertheless, she unequivocally identified Mr. Jimenez as the shooter. Meanwhile, Mr. Ramos, who claimed to "know" the shooter, vacillated significantly on whether he recognized Mr. Jimenez as the shooter throughout the entire investigation and trial.[12]

### b. Alibi Witnesses

Mr. Delgado and Mr. Hernandez have stated that Mr. Jimenez was with them around the time of the crime. The shooting occurred around 5:00 p.m. on June 25, 1992. (Tr. at 150; H. at 48).

---

[12] It is also worth noting that the jury had difficulty in reaching a verdict. When they informed the trial judge that they were at an impasse, he instructed them to continue deliberating. (Tr. at 473-74). During this time, the jury requested a read-back of virtually all of the trial testimony. (Tr. at 468). Significantly, they requested a read-back of Mr. Ramos' testimony twice, signaling a reliance on his in-court identification of Mr. Jimenez as the shooter. (Tr. at 468, 482). Moreover, it is worth noting that the jury heard only three days of testimony, (excluding the days for opening statements and summations), yet they deliberated for two full days. Given the short length of the trial, that ratio is telling.

According to Mr. Delgado and Mr. Hernandez, Mr. Jimenez was with them and their group of friends that day celebrating Mr. Hernandez's eighteenth birthday at the intersection of Mt. Eden and Townsend Avenue. (H. at 161-62, 217, 231; Delgado Aff., ¶¶ 5-6; Hernandez Aff., ¶¶ 3, 9). According to Mr. Hernandez, Mr. Jimenez arrived between 11:00 a.m. and noon. (H. at 165-66, 192; Hernandez Aff., ¶ 4). Similarly, Mr. Delgado asserted that when he arrived around noon or 1:00 p.m., Mr. Jimenez, who lived nearby, was already there. (H. at 217-18, 239; Delgado Aff., ¶ 5). They explained, in detail, what they were doing and attested that they never left the intersection of Mt. Eden and Townsend Avenues until approximately 10:00 p.m. on the date of the murder. (H. at 166, 187-89, 216-18, 241-44; Delgado Aff., ¶ 5; Hernandez Aff., ¶ 4).

Moreover, their statements are corroborated by the fact that Mr. Jimenez's trial lawyer had additional alibi witnesses at the time of trial. (Alibi Notes; Tr. at 87 (stating that he "had three alibi witnesses"). Importantly, his notes suggest that those witnesses would have attested to the same alibi provided by Mr. Delgado and Mr. Hernandez. (Alibi Notes). Trial counsel's notes and the Notice of Alibi he submitted to the trial court also identify Raymond Rosario as an alibi witness, and Mr. Delgado and Mr. Hernandez confirmed he was with them celebrating Mr. Hernandez's birthday. (Alibi Notes; H. at 162, 231; Delgado Aff.,

45

¶ 5).  Finally, the prosecutor had a manila folder in his case file
labeled "Alibi" with the name "Leo Gonzalez," the friend whom Mr.
Delgado testified initially contacted the trial lawyer regarding
the alibi.  (Stipulation, ¶ 1; H. at 251-52).  Taken together,
these facts support the reliability of the asserted alibi.

To be sure, these alibi statements -- even if fully credited
-- do not eliminate the possibility that Mr. Jimenez committed the
crime.  Neither witness recalled the precise time that Mr. Jimenez
arrived or when everyone else arrived that day, although both state
they are certain that Mr. Jimenez arrived before noon.  (H. at 165-
66, 192, 217, 239-41; Delgado Aff., ¶ 5; Hernandez Aff., ¶ 4).  Nor
can they say the exact time that Mr. Jimenez left the birthday
party, though both are certain he was there well into the evening,
until about 10:00 p.m. (H. at  166, 217-18, 242; Delgado Aff., ¶ 5;
Hernandez Aff., ¶ 4).  Mr. Hernandez admits that they occasionally
left the corner to eat, use the bathroom, purchase beer in the
grocery store, and purchase marijuana at the corner of Mt. Eden and
Jerome Avenue.  (H. at 188-90, 206).  Thus, he concedes that Mr.
Jimenez was not continuously in his line of sight.  In addition,
they were about a mile from the murder (approximately a twenty
minute walk each way), and Mr. Jimenez was familiar with the area
because he used to play baseball in the adjacent park and visited
his probation officer near that area.  (H. at 173, 329-32).  Thus,

the alibi witnesses' statements do not preclude the possibility that Mr. Jimenez could have left the birthday celebration, committed the crime, and returned. However, I find it unlikely that Mr. Jimenez could have left the birthday party, walked a mile, committed a murder, and then returned to the gathering without his friends noticing a change in his demeanor or otherwise becoming suspicious. Indeed, the alibi witnesses stated that Mr. Jimenez was never gone longer than a few minutes.

As a legal matter, the actual innocence test "does not require absolute certainty about the petitioner's guilt or innocence." House, 547 U.S. at 538. The "appropriate question" is not whether the testimony "conclusively and definitively establish[es] [Mr. Jimenez's] innocence, but whether . . . a reasonable juror considering the entire mix of evidence in the case would more likely vote to acquit or to convict." Rivas, 687 F.3d at 545; see also id. at 543 (noting that "it may be enough for the petitioner to introduce credible new evidence that thoroughly undermines the evidence supporting the jury's verdict"). In Schlup, for example, the petitioner "presented statements from [two alibi witnesses] that cast doubt on whether [the petitioner] could have participated in the murder" in light of his location elsewhere around the same time. Schlup, 513 U.S. at 331. The Court noted that if these statements were "true . . . it surely [could not] be said that a

47

[reasonable] juror . . . would vote to convict." <u>Id.</u>  Here, although the alibi witnesses do not establish with certainty that Mr. Jimenez did not commit the crime, they certainly "cast doubt" on the already thin evidence supporting the jury's verdict, and the statements would provide reason for reasonable jurors to not convict.  <u>Id.</u>

       c.  <u>Mr. Ramos</u>

Mr. Ramos' already dubious identification of Mr. Jimenez is undermined further by the statements he made in the years after the trial.  Given the jury's reliance on Mr. Ramos' in-court identification, the inability to ascertain how much of the shooting Mr. Ramos actually witnessed, combined with his repeated waffling on his identification, his statements severely "undermine[] the evidence supporting the jury's verdict." <u>Rivas</u>, 687 F.3d at 542-43.

First, all of Mr. Ramos' statements vary significantly in terms of his position during the shooting and how much he actually did or did not see.  In his statement to the police the day after the murder, Mr. Ramos said that as the shooter approached and got closer, he separated himself from Mr. Brana and Ms. Velazquez. (Ramos DD5 at 1).  During the trial, Mr. Ramos testified that he was "right there looking at [Mr. Brana] in front of me" during the encounter and that he saw shooter fire a fourth shot into Mr.

48

Brana's forehead. (Tr. at 258). In his affidavit, Mr. Ramos is significantly less clear about his position; he stated that he crossed the street and was looking at Mr. Brana. (Ramos Aff., ¶ 1). He further stated that he "heard" three or four gunshots. (Ramos Aff., ¶ 1). At his deposition for this proceeding, he said that he heard the shooter call Mr. Brana a "mamaguevo" and shoot him, but "I don't know anything from there on. I just left." (Deposition of Harry Ramos dated May 25, 2012 ("Ramos Dep."), Respondent's Evidentiary Hearing Exh. 2, at 12). When asked if he ever saw anybody get shot, Mr. Ramos simply responded that he "heard the shots." (Ramos Dep. at 12). Finally, at the evidentiary hearing, Mr. Ramos first asserted that he stayed "there like more or less like next to [Mr. Brana]" during the encounter. (H. at 49). However, when asked whether he remembered whether Mr. Brana was shot in the forehead, Mr. Ramos responded that he was "hidden right beneath the almond tree." (H. at 53). He clarified that he saw when Monaguillo "shot [Mr. Brana] the first time, and then [he] hid." (H. at 53). Mr. Ramos claimed that he "hid, and then when [the shots] happened, everybody went running." (H. at 53).

Mr. Ramos' position during the shooting is also called into question by Ms. Velazquez's trial testimony. She stated that she only remembered Mr. Ramos speaking to Mr. Brana "about going back

upstairs" before the shooting occurred. (Tr. at 166, 221-22). She testified that "[Mr. Ramos] was around, but I don't recall him joining us." (Tr. at 166).

Moreover, Mr. Ramos repeatedly vacillated in his identification of Mr. Jimenez. First, he selected a photo of Mr. Jimenez at the precinct the day after the shooting. (Tr. at 39, 58; Ramos DD5 at 2). However, he then failed to make an identification at the lineup. (Lineup Notes, ¶ 3). At the trial, Mr. Ramos first testified that he did not see the shooter in the courtroom, then stated that Mr. Jimenez "looks like" the shooter, and finally identified him as the shooter. (Tr. at 254, 258-59, 265).

Since the trial, upon learning that Mr. Jimenez is of Puerto Rican heritage, Mr. Ramos has unequivocally recanted his identification by his affidavit, at his deposition, and at the evidentiary hearing, stating repeatedly that Mr. Jimenez was not the shooter. (H. at 22-23, 26, 56-57, 61-62, 64-66, 72, 89; Ramos Aff., ¶ 4; Ramos Dep. at 19). Given that Mr. Ramos' identification of Mr. Jimenez at the time of trial was so equivocal, his insistence now that Mr. Jimenez was not the shooter would give reasonable jurors an additional reason not to convict.

d.    Mr. Jimenez's Testimony

Finally, Mr. Jimenez testified that on June 25, 1992, he

attended the birthday party at the corner of Mt. Eden and Townsend Avenue. He stated that although he does not remember their activities hour-by-hour, he does remember generally what they did, including "punch[ing]" Mr. Hernandez eighteen times to celebrate his birthday. (H. at 282, 295, 302, 314-15, 358). He testified that he arrived between 11:00 a.m. and noon and left the party around 8:00 p.m. that evening. (H. at 281). Furthermore, Mr. Jimenez has always insisted the eyewitnesses were mistaken and has maintained his innocence since the date of his arrest. (Interview of Rafael Jimenez dated Oct. 15, 1992, at 4, 14-15; H. at 283, 345, 354, 356).

Needless to say, a habeas petitioner's own testimony must be treated with suspicion. But I have observed Mr. Jimenez's demeanor and found him to be a believable witness. His account was cogent, sufficiently detailed, and substantially consistent with the testimony of the alibi witnesses, and it was not undermined in any significant way on cross-examination. His testimony thus lends additional (albeit limited) support to his actual innocence claim.

Based on all of the evidence, both old and new, I conclude that Mr. Jimenez has established a compelling claim of actual innocence. See House, 547 U.S. at 537. That evidence -- Ms. Velazquez's description that does not match Mr. Jimenez, Mr. Ramos' dubious identification and eventual recantation, Mr. Jimenez's

plausible alibi supported by two reliable witnesses, and the weakness of the prosecution's case -- I find it "more likely than not any reasonable juror would have reasonable doubt" as to Mr. Jimenez's guilt. <u>House</u>, 547 U.S. at 538. Because Mr. Jimenez has presented a "credible" and "compelling" claim of actual innocence, his is one of those "'extraordinary cases' warranting an equitable exception to AEDPA's limitation period." <u>Lopez</u>, 915 F. Supp. 2d at 417 (quoting <u>Rivas</u>, 687 F.3d at 518).

<u>Conclusion</u>

For the reasons set forth above, I recommend that Mr. Jimenez be allowed to pass through the actual innocence gateway to have the merits of his claims heard despite his failure to timely file his habeas petition. However, due to the limited scope of the evidentiary hearing, I decline to address the merits of such claims in this Report and Recommendation. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Alison J. Nathan, Room 2102, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          October 10, 2017

Copies transmitted this date:

Glenn A. Garber, Esq.
Glenn A. Garber P.C.
233 Broadway, Suite 2370
New York, NY 10279

Rebecca Freedman, Esq.
The Exoneration Initiative
233 Broadway, Suite 2370
New York, NY 10279

Nancy D. Killian, Esq.
Matthew B. White, Esq.
Andrew Zapata, Esq.
Bronx District Attorney's Office
198 E. 161st St.
Bronx, NY 10451