UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JUN 0 7 2018

Rafael Jimenez,

        Petitioner,

    —v—

Lynn Lilley, *Superintendent, Woodbourne Correctional Facility*,

        Respondent.

16-CV-8545 (AJN)(RWL)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Petitioner Rafael Jimenez is before the Court on a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for second degree murder. Petitioner argues that he is actually innocent and that his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), were violated as a result of witness tampering by the police.

The Court presently considers the threshold question of whether Jimenez's petition is time-barred under the statute of limitations established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). In a Report and Recommendation dated October 10, 2017 ("R&R" or "Report"), Magistrate Judge James C. Francis IV recommended that the Court allow Mr. Jimenez "to pass through the actual innocence gateway to have the merits of his claims heard despite his failure to timely file his habeas petition." *Jimenez v. Lilley*, No. 16-CV-8545 (AJN)(JCF), 2017 WL 4535946, at *18 (S.D.N.Y. Oct. 10, 2017) [hereafter, "R&R"]. Judge Francis did not reach the merits of Petitioner's claim. Respondent submitted timely objections to the Report.

For the following reasons, the Court DENIES Respondent's objections to the Report and adopts the Report in its entirety.

## I. Procedural Background

On November 4, 2016, Petitioner Rafael Jimenez filed a petition for a writ of habeas corpus. Dkt. No. 1. On March 7, 2017, Respondent Lynn Lilley, represented by the Bronx County District Attorney's Office, filed his opposition to the petition. Dkt. Nos. 10-11. Magistrate Judge Francis held an evidentiary hearing on the so-called "gateway innocence" issue on June 26 and June 29, 2017, at which various individuals testified, including the Petitioner.

On October 10, 2017, Judge Francis issued a Report and Recommendation finding that Mr. Jimenez presented a "credible" and "compelling" claim of actual innocence, that his case warranted an equitable exception to AEDPA's limitation period, and that the merits of his petition should be considered. R&R at *17-18. Respondent timely filed objections, and Petitioner was granted leave to, and filed, a reply. Dkt. Nos. 34-39.

On January 24, 2018, the Court scheduled oral arguments on the objections to the R&R, and sought clarification of the arguments the parties had made about the "meaning and practical scope of the R&R," arguments the Court viewed as "incidental (at best) to the issue at hand." Dkt. No. 41 (quoting Dkt. No. 39 at 21). Accordingly, the Court offered the parties "an opportunity to reevaluate their arguments." *Id.*

On March 23, 2018, Respondent filed his revised objections to the R&R, and Petitioner filed his revised reply on April 6, 2018. *See* Amended Objections to Magistrate's Report and Recommendation ("Am. Obj."), Dkt. No. 43; Response to Amended Objections to Magistrate's Report and Recommendation ("Reply"), Dkt. No. 44. On April 24, 2018, the Court heard oral arguments on the revised arguments. Following oral arguments, the parties submitted to the

2

Court a complete set of the exhibits presented to Judge Francis at his June 2017 evidentiary hearing.

## II. Standard of Review

When reviewing a report and recommendation, a district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). If a party files objections to the report and recommendation, as here, the district court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* Any unobjected-to portions of the report and recommendation, however, are reviewed for clear error. *Watson v. Geithner*, No. 11-CV-9527 (AJN), 2013 WL 5441748, at *2 (S.D.N.Y. Sept. 27, 2013); *see* Fed. R. Civ. P. 72(b).

In making a *de novo* determination on a matter specifically objected to, a district court judge "has discretion in the weight placed on the proposed findings and recommendations and may afford a degree of deference to the Report and Recommendation." *Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62, 67 (S.D.N.Y. 2013) (citing *United States v. Raddatz*, 447 U.S. 667, 676 (1980)). Specifically, credibility determinations made by a magistrate judge who had the opportunity to view and hear witnesses are entitled to "considerable deference on review." *Roman v. Abrams*, 822 F.2d 214, 228 (2d Cir. 1987) (stated in the context of appellate review of a district court "trier of fact"). The Second Circuit has instructed that "a district judge should normally not reject a proposed finding of a magistrate judge that rests on a credibility finding without having the witness testify before the judge." *Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999). By contrast, a district judge can *accept* a magistrate's recommendation without hearing the contested testimony. *See Raddatz*, 447 U.S. at 676.

In reviewing the R&R, the Court reviewed the transcript of the original trial, the transcript of the evidentiary hearing before Judge Francis, as well as each exhibit presented to Judge Francis. Having not found the need to hold its own hearing, the Court does accord deference to the credibility determinations Judge Francis made based on his assessment of the witnesses' demeanor.

## III. Factual Background and Summary of R&R and Objections

The Court assumes the parties' familiarity with Judge Francis's R&R and offers a brief summary here to help situate the discussion below.

### A. Factual Background

Respondent lodges a few factual objections addressed below; notwithstanding the Court's disposition of those few objections, the Court otherwise adopts the factual recitation as set forth in the R&R and supported by the trial transcript.

On June 25, 1992, Carmen Velazquez and her seven-year-old stepdaughter were harassed by a group of men on their way in and out of a supermarket in the Bronx. R&R at *1. Velazquez relayed what had happened to her husband, the victim, Michael Brana. *Id.* Upset, Brana returned home from work early and stood outside the apartment they shared, watching for the man who had harassed his wife. *Id.* At some point, Harry Ramos, an acquaintance, joined Velazquez and Brana in front of the building. *Id.* While the three were standing there, a group of approximately five men approached. *Id.*

According to Velazquez, a short man stepped forward from the group, pointed to a man standing behind him, and asked Brana if that was the man Brana had been looking for. *Id.* at *2. When Brana said he was not looking for anyone, the short man stepped aside and the man behind him pulled a gun from his waist and shot Brana three times. *Id.* Velazquez testified that she had

4

an unobstructed view of the shooter's face for about thirty seconds from a distance of about eleven feet. *Id.* She testified at trial that based on the short man's accent, she believed the group of men were Dominican. *Id.*

Ramos testified to a slightly different version of events.[1] According to Ramos, the group of men, whom he believed to be Dominican, exchanged words with Brana about the harassment of Ms. Velazquez, and one of the men punched Brana. *Id.* When Brana put up his fists to fight back, that man moved out of the way, exposing the shooter. *Id.* Ramos testified that he had known the shooter by the nickname Monaguillo for one or two years. *Id.* According to Ramos, the shooter said to Brana in Spanish, "[H]ey cocksucker what is it that you want?" *Id.* The shooter then pulled a gun from his waistband and shot Brana three times; when Brana tried to grab the shooter, he fired a fourth shot into Brana's forehead. *Id.*

Approximately thirty minutes after the shooting, Velazquez spoke with Detectives Floyd Coor and Kenneth Thompson in her apartment. *Id.* She described the shooter as twenty-five or twenty-six years old, about five feet six inches tall, with three to four inch long black hair worn in a Jheri curl style, tanned olive-colored skin, and a light mustache and goatee, and wearing a white tank top and khaki-colored shorts. *Id.* Velazquez said he "[s]eemed Dominican." *Id.* After the interview, she was brought to the local precinct to view photographs, but was unable to identify the shooter. Detective Thompson testified that Jimenez's photograph was not among those she viewed. *Id.*

The next day, Thompson spoke to Ramos. He did not ask Ramos for a description of the shooter because Ramos "knew the subject." *Id.* Rather, Ramos was brought to a precinct to view photographs of potential suspects. *Id.* The photographs were different from those viewed by

---

[1] Ramos testified at trial in Spanish, and his testimony was translated for the jury.

Velazquez, and from the trays, each of which contained several hundred photographs, Ramos identified a photograph of Mr. Jimenez. *Id.* Detective Thompson then showed a photo array including a more recent photograph of Jimenez to Ms. Velazquez, who immediately identified Jimenez. *Id.* at *3.

After a few weeks, and after a wanted poster was circulated citywide, Jimenez was arrested and placed in a lineup. *Id.* Ramos viewed the lineup first but did not make an identification. *Id.* Detective Thompson testified that Ramos's father, who accompanied him to the precinct, attempted to discourage Ramos from getting involved or making a positive identification,[2] that Ramos seemed apprehensive about viewing the lineup, and that he believed Ramos refused to make an identification. *Id.*

Ms. Velazquez also viewed the lineup. She was driven to the precinct by the victim's sister and looked at the wanted poster while in the car, which displayed the same photograph of the petitioner that Velazquez had picked out in the photo array. *Id.* Velazquez quickly identified Mr. Jimenez in the lineup, and later testified at trial that she was able to identify him based on her memory of the shooting rather than from viewing the wanted posters. *Id.* Velazquez's lineup identification was the subject of a hearing in the trial court pursuant to *United States v. Wade*, 388 U.S. 218 (1967), but the court denied Jimenez's motion to suppress the identification as tainted. *Id.*

---

[2] Respondent objected to the R&R's statement that "Mr. Ramos' father accompanied him to the precinct and seemed to discourage Mr. Ramos from getting involved in the case or making a positive identification," R&R at *3, arguing that Ramos's father *did* discourage him. Am. Obj. ¶ 8. While it may be a semantic difference, the Court cannot know whether Ramos was actually discouraged by his father's statements absent Ramos's admission of exactly that. The R&R's description is fair.

At the same pretrial hearing, defense counsel noted that he was attempting to get a hold of three alibi witnesses. *Id.* Defense counsel[3] later filed a Notice of Alibi announcing his intent to call Raymond Rosario, one of Jimenez's friends, as a witness at trial, and trial counsel's notes indicate he had considered calling several other friends at trial, including Danny Hernandez. *Id.*

At trial, Velazquez unequivocally identified Jimenez as the shooter, but Ramos did not immediately make the identification. *Id.* at *4. He testified that he did not recognize anyone at the lineup because he "did not remember too well," but eventually admitted at trial that Jimenez "look[ed] like" the shooter.[4] *Id.* Ramos testified that he believed the shooter was Dominican because he knew him "for about a year or two." *Id.* On re-direct he finally identified the petitioner as the shooter, and on re-cross affirmed that he "s[aw] Monaguillo in the courtroom." *Id.* Detective Coor testified that Velazquez's statement had been taken by two detectives and that the reports may have contained errors. *Id.* And the defense called Mr. Jimenez's probation officer from 1992, who testified that he had never seen Jimenez with Jheri curls. *Id.*

During deliberations, the jury requested a read-back of nearly all of the trial testimony, including twice asking for a read-back of Ramos's testimony. *Id.* After a few hours of deliberations, they informed the court that they were unable to reach a verdict; the trial judge instructed them to continue, and after another two days, the jury convicted Jimenez of murder in the second degree. *Id.* He was sentenced to an indeterminate term of twenty-five years to life imprisonment. *Id.*

---

[3] Respondent objected to the R&R for stating that petitioner's trial counsel filed a Notice of Alibi, when it was actually filed by petitioner's prior counsel. Am. Obj. ¶ 7. Respondent is correct that it was not trial counsel who filed the Notice of Alibi. *See* Petition for Writ of Habeas Corpus, Dkt. No. 1, Ex. 14a.

[4] Respondent lodges an objection styled as a "factual objection" to the R&R's recitation as "misleading," arguing that the trial transcript makes clear that Ramos did not initially identify petitioner because he was scared, and suggesting that petitioner's action in "shaking his head no" when Ramos was asked to make an identification was some sort of signal to Ramos. Am. Obj. ¶ 9. Respondent's objection offers a particular interpretation of what happened at trial, however there is nothing incorrect about the R&R's description of what occurred at trial. *See* R&R at *4.

In 1996, Jimenez appealed, but the Appellate Division, First Department, affirmed his conviction, and the New York Court of Appeals denied leave to appeal. *People v. Jimenez*, 647 N.Y.S.2d 947; *People v. Jimenez*, 89 N.Y.2d 924 (1996). In 2001, Jimenez filed a *pro se* motion to vacate his conviction, but the state court denied his motion as procedurally barred.[5] R&R at *4. In 2014, he filed another motion to vacate his conviction based on actual innocence, newly-discovered evidence, and violations of due process, raising substantially the same issues he asserts here. *Id.* at *5. On February 13, 2015, Justice Barbara Newman denied the motion, and the First Department denied leave to appeal on November 5, 2015. *Id.*; *see People v. Jimenez*, 9 N.Y.S.3d 594 (Table) (N.Y. Sup. Ct. 2015).

On November 4, 2016, Jimenez filed the instant petition for a writ of habeas corpus. The Respondent argues that the petition is time-barred. Jimenez responds that his petition is timely, or that, alternatively, he is entitled to an exception from the one-year limitations period because he is actually innocent. Because a finding that the petition is time-barred would be case dispositive, Judge Francis decided to submit his findings on the threshold issue of its timeliness in the form of a report and recommendation, and not to resolve the petition on the merits. *See* R&R at *1, n.1.

Accordingly, the Court also does not address the merits of the petition here. The only question resolved in this order is whether Mr. Jimenez's habeas petition is time-barred.[6]

---

[5] Per Respondent's objection to the way the R&R describes Mr. Jimenez's *pro se* motion, the Court notes that that motion did not claim counsel was ineffective for failing to raise an alibi defense, nor did he assert the substantive claims set forth in his habeas petition. Am. Obj. ¶ 10.

[6] At oral arguments on the objections, Petitioner made clear that the Court's determination here would not necessitate a finding of actual innocence at the merits stage, *see* Tr. 37:6-18, 63:20-64:1, and Respondent claimed that the Court's decision would have "no impact on the underlying claims." Tr. at 68:18-21. Citations to the transcript of oral arguments on the objections are denoted as "Tr.," citations to the transcript of the evidentiary hearing before Judge Francis are denoted as "H.," and citations to the transcript of the original trial are denoted as "Trial Tr."

**B. Summary of R&R**

Under the AEDPA, which provides a remedy for a state prisoner when his continued custody is in violation of federal law, there is a one-year period of limitations running from the latest of a number of dates, including "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). As further discussed below, the AEDPA limitations period can also be overcome if the prisoner makes "a credible showing of actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). Judge Francis first considered whether Jimenez's petition was timely under § 2244(d)(1)(D), but calculated the total number of days the petitioner waited at 371 days, and concluded that his petition was untimely. R&R at *6.[7]

Judge Francis continued on, however, to consider whether Petitioner's claim of actual innocence was credible and compelling, amounting to the rare case in which a petitioner's procedural default should be excused. *Id.* at *7. Judge Francis concluded that Petitioner's claim of actual innocence did excuse his procedural default, allowing him to pass through the so-called "gateway" actual innocence exception. *Id.* at *18.

First, the R&R considered whether Petitioner's claim is credible – that is, whether it is supported by "new reliable evidence." *Id.* at *7 (quoting *House v. Bell*, 547 U.S. 518, 537 (2006)). The R&R defined new evidence as evidence not presented to the jury during the trial. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 324 (1995) and *Rivas v. Fischer*, 687 F.3d 514, 543 (2d Cir. 2012)).

---

[7] Petitioner's response to Respondent's amended objections does object "to the finding in the R&R that he failed to meet the statute of limitations imposed by 28 U.S.C. § 2244(d)(1)." *See* Reply ¶ 3. However, Petitioner's objections were due by November 14, 2017 at the very latest, *see* Dkt. No. 33, he did not raise this objection in his response to Respondent's first objections, *see* Dkt. No. 39, and the objection is untimely under Federal Rule of Civil Procedure 72(a). Applying a "clear error" standard to this section of the R&R, then, the Court does not find that Judge Francis committed clear error in concluding that Jimenez's petition was time-barred under § 2244(d)(1).

The first major piece of new evidence consists of an affidavit from Mr. Ramos in which he states that, contrary to his trial testimony, he no longer believes Jimenez is the shooter. Part of Ramos's stated basis for his changed opinion is that he heard the shooter use a slang word "mamaguevo" that Dominicans use, and that when he later learned that Mr. Jimenez is actually Puerto Rican, he was "completely certain" that Jimenez is not the shooter. *Id.* at *8-9. Additionally, Petitioner submits the affidavit of Dr. Cecelia Cutler, Ph.D. in Sociolinguistics, who identifies the dialect differences between Dominican and Puerto Rican Spanish and highlights studies supporting Mr. Ramos's ability to distinguish between the two dialects. *Id.* at *9. The second major piece of "new" evidence Petitioner submits are affidavits of two alibi witnesses, Amancio Delgado and Danny Hernandez, who claim that on the day of the murder, Jimenez was with them celebrating Hernandez's birthday. *Id.* Judge Francis concluded that this evidence, along with an evidentiary stipulation he received from the parties disclosing that the Assistant District Attorney at trial had a folder in his case file labeled "Alibi" containing information for another of Jimenez's friends, all constitutes "new" evidence for actual innocence purposes. *Id.*

The R&R continued on to consider whether this "new" evidence is also "reliable." For various reasons discussed below, Judge Francis concluded that the new testimony from the alibi witnesses is reliable, despite the state court's earlier determination to the contrary. *See id.* *9-12. Similarly, Judge Francis concluded that there is "clear and convincing evidence to overcome the State court's findings" regarding Ramos's recantation. *Id.* at *12. The R&R found his statements to be reliable. *Id.* at *13-14.

Second, having established that the new evidence in support of Petitioner's innocence claim is credible, the R&R considered whether the evidence is "compelling." In consideration of

the "compelling" prong, a court analyzes "all the evidence, old and new." *House*, 547 U.S. at

537. For a claim to be compelling, the petitioner must demonstrate that "more likely than not, in

light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt

– or to remove the double negative, that more likely than not any reasonable juror would have

reasonable doubt." *Rivas*, 687 F.3d at 541 (quoting *House*, 547 U.S. at 538).

The R&R explored the weakness of the prosecution's evidence at trial, including various

inconsistencies in the testimony of the main witnesses. R&R at *14-15. Judge Francis then

considered the proper weight the new alibi affidavits should be afforded, finding that the

witnesses "certainly 'cast doubt' on the already thin evidence supporting the jury's verdict." *Id.*

at *16 (quoting *Schlup*, 513 U.S. at 331). Finally, the R&R considered the importance of

Ramos's recantation and Mr. Jimenez's own testimony and conduct. *Id.* at *16-17.

Taking all of the evidence, both old and new, together, Judge Francis concluded that "Mr.

Jimenez has established a compelling claim of actual innocence." *Id.* at *17. In summing up the

evidence, he observed that Ms. Velazquez's description does not match Mr. Jimenez, that Mr.

Ramos's initial identification was dubious and is now recanted, that Jimenez's plausible alibi is

supported by two reliable witnesses, and that the prosecution's case was weak overall. *Id.* Judge

Francis concluded that Jimenez presents one of those "'extraordinary cases' warranting an

equitable exception to AEDPA's limitation period." *Id.* (quoting *Lopez v. Miller*, 915 F. Supp. 2d

373, 417 (E.D.N.Y. 2013) (quoting *Rivas*, 687 F.3d at 518)).

## C. Summary of Objections

Respondent objects to the vast majority of the R&R, and each key objection is set forth in

more detail and analyzed below. In brief, Respondent argues that the R&R "failed to consider

evidence contrary to the finding of actual innocence, failed to give due deference to the State

court's finding that defendant was not actually innocent...and failed to give due consideration to petitioner's twenty-year delay in raising these claims." Am. Obj. ¶ 4. Respondent does not object to the R&R's conclusion that the petition was untimely under AEDPA's statute of limitations, but argues that in all other respects the R&R "is legally and factually wrong and should not be adopted by this Court." *Id.*

## IV. Analysis

For the sake of clarity, the Court adopts the structure of the R&R and analyzes each section, and Respondent's objections to each section, in turn.

As an initial matter, the Court notes that the Respondent only objects to the R&R's description of the applicable legal standard in a few ways, which generally pertain more to Judge Francis's application of the laws to the facts, than to his description of the standard itself. In any event, the Court, having carefully reviewed the relevant case law, finds no clear error in Judge Francis's discussion of the applicable framework for analysis. To the extent that the Respondent quarrels with the R&R's description of the relevant legal standard, the Court addresses those objections below.

Accordingly, to excuse Petitioner from his untimely federal habeas petition, his claim of actual innocence must both be "credible" and "compelling." *Rivas*, 687 F.3d at 541. The Court analyzes these two prongs in turn, beginning with credibility's own two-pronged analysis. For a claim to be credible, it must be supported with "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts or critical physical evidence – that was not presented at trial." *House*, 547 U.S. at 537 (quoting *Schlup*, 513 U.S. at 324).

## A. Objections Regarding the R&R's Conclusion that There Is "New" Evidence

Respondent objects to the R&R's consideration of the affidavits and testimony of Amancio Delgado and Danny Hernandez (collectively, the "alibi witnesses") as "new" evidence, since their testimony was available at the time of trial. Am. Obj. ¶ 14. Specifically, Respondent takes issues with the R&R's characterization of the definition *Rivas* sets for "new" evidence. *Id.*

Judge Francis adopted the definition for "new" evidence that it is "all evidence that was not <u>presented to the jury</u> during trial." R&R at *7 (quoting *Lopez*, 915 F. Supp. 2d at 400 n.16) (emphasis in original). The quoted footnote in *Lopez* describes a split among federal circuit courts between those that define "new" evidence as evidence that was not *available* at the time of trial (or that could not have been discovered through the exercise of due diligence), *see, e.g.*, *Osborne v. Purkett*, 411 F.3d 911, 920 (8th Cir. 2005), and those that define "new" evidence as "newly presented" instead of "newly available." *See, e.g.*, *Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir. 2003). As the footnote in *Lopez* notes, the Second Circuit in *Rivas* "did not discuss the issue in detail, but appears to have taken the 'newly presented' side of the circuit split" in stating that "new evidence" is "evidence not heard by the jury." *Lopez*, 915 F. Supp. 2d at 400, n.16 (quoting *Rivas*, 687 F.3d at 543). On the basis of this analysis, Judge Francis adopted the same understanding of *Rivas*. R&R at *7 n.8.

The Respondent seeks to minimize the relevant language in *Rivas* as simply stating "in passing" that new evidence is "evidence not heard by the jury," and notes that the "new" evidence in *Rivas* was unavailable at trial. Am. Obj. ¶ 14.

In the face of the Supreme Court decision in *McQuiggin v. Perkins*, Respondent's position is untenable. In *McQuiggin*, although directly focusing on the question of how a petitioner's delay in filing affects the reliability of a petitioner's proof, the Supreme Court stated

13

that "untimeliness, *although not an unyielding ground for dismissal of a petition*, does bear on the credibility of evidence proffered to show actual innocence." 569 U.S. at 401 (emphasis added). The Supreme Court's insistence that timeliness not be treated "as a threshold inquiry," *id.* at 400, plainly implies that evidence available at trial may still be deemed "new" for the gateway analysis, but that courts must consider any untoward delay as undermining the credibility of the petitioner's innocence claim.[8] The Seventh Circuit offers a similar interpretation of *McQuiggin*, writing that the Supreme Court has explained that the absence of a newly discovered requirement in *Schlup* was not mere oversight, and holding that testimony not presented at trial "can be considered for [petitioner's] actual innocence gateway theory, though any unexplained delay calls for some skepticism on our part." *Gladney v. Pollard*, 799 F.3d 889, 898-99 (7th Cir. 2015); *but see Shank v. Vannoy*, 2017 WL 6029846, at *2 (5th Cir. Oct. 26, 2017) (holding, after *McQuiggin*, that petitioner's evidence must have been unavailable to him at the time of trial to be considered "new").

Assuming *arguendo* that *McQuiggin* does not resolve the issue, the Court still agrees with the standard adopted by Judge Francis from *Rivas* ("evidence not heard by the jury") and *Schlup* ("not presented at trial"). Even if *Rivas* did not fully explicate the standard, and even if the new evidence in *Rivas* was unavailable at trial, in the absence of any contrary direction from the Second Circuit or Supreme Court, Respondent goes too far by dismissing this definition. Moreover, the Court's research suggests that the majority of courts in this Circuit to have considered the question have, like Judge Francis, adopted *Rivas*'s definition of "evidence not

---

[8] Respondent notes that the district court on remand stated that petitioner's evidence "was substantially available...at the time of trial," and "thus was hardly 'new.'" Tr. at 7:12-16; *Perkins v. McQuiggin*, No. 08-CV-139, 2013 WL 4776285, at *3 (W.D. Mich. Sept. 4, 2013). However, the district court does not definitely decide this issue, and even if it had, its disposition would not be binding on this Court. It is the Supreme Court decision that binds this Court.

heard by the jury." *See, e.g., Hyman v. Brown*, 197 F. Supp. 3d 413, 460 n.61 (E.D.N.Y. 2016); *Trisvan v. Ercole*, No. 07-CV-4673 (NG), 2015 WL 419685, at *6 (E.D.N.Y. Jan. 30, 2015); *Diaz v. Bellnier*, 974 F. Supp. 2d 136, 144 (E.D.N.Y. 2013); *but see Germain v. Racette*, No. 13-CV-1530 (MAD), 2015 WL 7573225, at *5 (N.D.N.Y. Nov. 25, 2015) (finding that evidence must not have been available for a petitioner to use at trial).

Respondent cites to one post-*McQuiggin* case in which the judge seemingly opted for the less expansive definition of "new," but the case considered the pretrial availability of the evidence as one factor, also dismissing the petitioner's actual innocence claim because "the evidence falls far short of casting doubt on Petitioner's conviction." *Boone v. United States*, No. 13-CV-8603 (JMF), 2015 WL 5139143, at *3 (S.D.N.Y. Sept. 1, 2015). Moreover, in *Boone*, the district court considers petitioner's delay as a factor weighing against the credibility of his claim, as required by *McQuiggin*, but does not state that its availability at trial was solely dispositive.

Accordingly, the Court determines that the testimony and affidavits of Delgado and Hernandez, even if known to the defense team at the time of the trial, do constitute "new" evidence under *Rivas*.

## B. Objections Regarding the R&R's Conclusion that the "New" Evidence Is "Reliable"

For new evidence to be credible, however, it also must be deemed reliable. Respondent objects to Judge Francis's findings following an evidentiary hearing that the alibi witnesses and the recantation of Harry Ramos were reliable. *See* Am. Obj. ¶¶ 16-50. Moreover, in making those objections, Respondent argues that the R&R was insufficiently deferential to the State court's findings of facts under the standard set forth in 28 U.S.C. § 2254(e)(1). *Id.* ¶ 13. The Court addresses the R&R and the objections taking one type of evidence at a time.

### 1. Alibi Witnesses

Delgado and Hernandez submitted affidavits in this matter and also testified at the evidentiary hearing before Judge Francis in support of Petitioner's alibi. Both had submitted their affidavits in support of Petitioner's claim in State court, and that court had found them unreliable because the affidavits: "(1) described no specific activities supporting their memory of that day; (2) placed the petitioner within only one mile of the murder; (3) failed to show the petitioner remained at [the proffered location] throughout the relevant period; (4) corroborated Ms. Velazquez's testimony because the petitioner was in a group of males, one of whom was Dominican; (5) established that the petitioner had a Dominican friend and must therefore know Dominican profanities; and (6) were submitted by the petitioner's friends." R&R at *9 (summarizing and citing *Jimenez*, 9 N.Y.S.3d 594 (table), 2015 WL 770457, at *8-9). Judge Francis, applying § 2254(e)(1)'s presumption that "a determination of a factual issue made by a State court" is correct, despite no clear holding in this Circuit that this presumption applies to gateway actual innocence claims, *see id.* at *8, still found that "there is clear and convincing [evidence] rebutting the State court's credibility determination." *Id.* at *10. The State court did not conduct an evidentiary hearing nor hear the witnesses' testimony live, but Judge Francis did.

In brief, the R&R made its credibility determination because: 1) "[t]he testimony of each alibi witness is...detailed and largely consistent with that of the other;" 2) despite having once been friends with Jimenez, there was no evidence presented that the witnesses "were significantly affected by their relationship with the petitioner;" 3) their failure to present this alibi earlier is explained by their friend having been in touch with petitioner's trial lawyer and there is no evidence suggesting the witnesses manufactured the alibi; 4) and defense counsel's failure to call them at trial shows little about their credibility. *See id.* at *10-12.

Respondent objects to a number of the Magistrate's findings regarding the credibility of the alibi witnesses. First, Respondent argues that there are scant details that affirmatively suggest Delgado and Hernandez were recalling the correct day. Am. Obj. ¶ 17. Judge Francis credited that once Mr. Jimenez was arrested and his friend realized the shooting occurred on Hernandez's birthday, they "expected that they would need to remember their interactions with Mr. Jimenez from that day." R&R at *10. Both witnesses remember where the party was, what they did, and times during which they and Mr. Jimenez were in attendance. *Id.* That is, the major details were cross-corroborated, and the minor inconsistencies in the affidavits are largely immaterial, and may even be seen as bolstering the witnesses' credibility. *See Rosario v. Ercole*, 617 F.3d 683, 687 (2d Cir. 2010) (Jacobs, J., dissenting) ("First, if a witness is without flaw, I tend to suspect perjury; second, corroboration matters."). At oral arguments, Respondent argued that it was not believable that the petitioner and his friends would have spent over ten hours on the same street corner, Tr. 26:18-22, but offered no support for this contention. Jimenez, Hernandez, and Delgado all testified at the evidentiary hearing that their group of friends nearly always hung out at the corner of Mount Eden and Townsend in the Bronx because it was convenient to where the boys lived, and that they would leave for a few minutes at a time to grab food, use the bathroom, or buy drugs, but that otherwise most of them were there all day. *See, e.g.*, H. 187:1-193:21 (Hernandez); H. 205:13-207:20, 238:22-245:23 (Delgado); H. 295:2-297:5 (Jimenez). Given that this is how they socialized generally, and that it was Hernandez's 18th birthday that day, the Court finds no reason to doubt their consistent testimony, which Judge Francis found credible.

Respondent suggests that comparison of this evidence to the affidavits presented in two cases cited by Judge Francis, *McGahee* and *Leppert*, undermines the credibility findings in the

R&R. Am. Obj. ¶¶ 18-19; R&R at *10 (citing *United States v. Leppert*, 408 F.3d 1039, 1042 (8th

Cir. 2005) and *McGahee v. United States*, 570 F. Supp. 2d 723, 736 (E.D. Pa. 2008)). While it is

true that *McGahee* considered the evidence under a lower "reasonable probability" standard, if

anything, the greater inconsistencies between the affidavits and the continued close relationship

between the witnesses and the petitioner in that case only bolsters the R&R's conclusion that

Delgado and Hernandez are credible alibi witnesses here. *Cf. McGahee*, 570 F. Supp. 3d at 736-

37. Similarly, the facts in *Leppert*, a case relied upon in the R&R only for the general

proposition that cross-corroboration bolsters reliability, do not undermine Judge Francis's

conclusion.

Second, Respondent objects to the R&R's reliance on the fact that the crime happened on

Hernandez's 18th birthday as providing a reference for the alibi witnesses to remember the day,

because in petitioner's own video statement – taken a few months after the shooting – he fails to

recall anything about where he was on that day. Am. Obj. ¶ 20. While it is true that Judge

Francis did not discuss the video statement in his treatment of this fact, Respondent's assertion

that this omission undermines his conclusion is flawed. Jimenez's failure to connect the specific

date, June 25, 1992, with Hernandez's birthday, does not mean that Hernandez's birthday could

not serve as a reference point for others who have learned that the shooting occurred that day

(including a witness who was easily able to connect the date to their whereabouts because it was

*his* birthday). The significance of the birthday, rather, is that for Hernandez and Delgado (and

Jimenez, for that matter), upon piecing together that the shooting took place on Hernandez's 18th

birthday, then are able to remember where, when, and how they spent the day. Mr. Jimenez also

testified that he came to realize where he had been on June 25, 1992 after he learned that was

Mr. Hernandez's birthday. *See* H. 283:10-23.

Third, Respondent objects to the R&R's conclusion that the alibi evidence is not undermined by petitioner's relationships with Hernandez and Delgado, in contrast to the conclusion of the State court. Am. Obj. ¶ 21. Judge Francis considered the nature of the alibi witnesses' relationship with Petitioner in great detail. R&R at *10. Both Delgado and Hernandez testified that they lost most or all contact with Jimenez after his conviction and that at the time they began their correspondence with Petitioner's current counsel and submitted their affidavits, they no longer had any relationship with Jimenez. *Id.* The fact that they were very close around the time of the events, and that they have since somewhat rekindled their relationship, does not require the conclusion that their present testimony is motivated by a personal interest and bias. The R&R correctly cited a number of cases for the proposition that it is the nature of alibi witnesses that they often have some sort of relationship with the defendant and that friendship does not render their testimony inherently untrustworthy. *See id.* (citing *Poindexter v. Booker*, 301 F. App'x 522, 529 (6th Cir. 2008); *Bell v. Howes*, 757 F. Supp. 2d 720, 737 (E.D. Mich. 2010); *McGahee*, 570 F. Supp. 2d at 736; and *Bohan v. Kuhlmann*, 234 F. Supp. 2d 231, 281 (S.D.N.Y. 2002)).[9]

Fourth, Respondent objects to the R&R's conclusion that the actions of Hernandez and Delgado after petitioner's arrest – that is, that they did not reach out to defense counsel directly, speak to law enforcement, or take other proactive measures to present their alibi testimony – do not undermine the reliability of the alibi. Am. Obj. ¶ 22. Relatedly, Respondent objects to the R&R's conclusion that "defense counsel's failure to call the alibi witnesses at trial shows little

---

[9] Additionally, at oral arguments on the objections the Court asked Respondent's counsel what he believed the incentive would be for Delgado and Hernandez to wait so long to come forward, and he speculated that they did not come forward because they knew Jimenez was not with them the whole time that day and had been selling drugs in Brooklyn. Tr. 30:10-25. The Court fails to understand how that speculation provides any explanation for the twenty-year gap between their interactions with petitioner's trial counsel and their interactions with petitioner's current counsel, nor does it explain their willingness to testify now.

about their credibility." *Id.* ¶ 23 (quoting R&R at *12). It is a fair criticism of the R&R that

Judge Francis's conclusions here are speculative in nature. The R&R inferred that because

Delgado and Hernandez's friend Leo Gonzalez was already in touch with the trial attorney,

Delgado and Hernandez "could have reasonably inferred that going directly to the authorities

would have no additional impact on the case against Mr. Jimenez." R&R at *11; H. 251:5-253:7.

The R&R continued on to speculate that "[i]t is plausible that [Delgado and Hernandez] were not

called because defense counsel was unable to reach them, or that the lawyer was incompetent."

*Id.* at *12. However, Respondent's criticism only carries so much weight, as he also traffics in

rank speculation. Respondent suggests that "the only plausible conclusion as to why counsel did

not raise [the alibi defense] before is that it must have been so utterly unreliable as to be

valueless to the defense" or that the alibi witnesses stopped cooperating because "the abili is

false, and the witnesses did not want to perjure themselves." Am. Obj. ¶ 23, n.4; *see also id.* ¶ 24

(speculating that petitioner would have called the alibi witnesses if they "had been credible at

all"); *id.* ¶ 27 (speculating that because defense counsel contemplated an alibi defense suggests

"counsel himself did not find the alibi to be reliable"). Respondent also argues that it is

implausible that the alibi witnesses would have made an effort to remember where they were that

day, but then not to insist on testifying. *Id.* ¶ 29. But Respondent's attempt to connect their

ability to remember Mr. Hernandez's birthday to some sort of moral obligation to bypass defense

counsel and directly approach law enforcement with their story is unsupported by any record

evidence and purely speculative. The task of assessing why certain witnesses' testimony is first

presented over twenty years after trial naturally invites the Court's attempt to piece together the

1994 mindset of various persons. Upon this Court's *de novo* review of the record, however,

Judge Francis's evaluation of the most likely reasons for this delay and consequent reliability of the alibi witnesses' present testimony is the most plausible.

All in all, the R&R's assessment of the alibi witnesses and conclusion that their testimony is reliable is correct. Delgado and Hernandez offer plausible reasons for their memories of that day, plausible reasons for the twenty-year delay in their presentation, and affidavits that are internally consistent and cross-corroborative. Respondent's objections, and the State court's determination, are both speculative and contrary to the record as presented. The R&R correctly concluded that the sworn statements of the two alibi witnesses constitute "new reliable evidence" supporting Petitioner's actual innocence claim. *See Schlup*, 513 U.S. at 331 (statements of alibi witnesses would support actual innocence claim if found to be reliable).

### 2. Ramos's Recantation

The above analysis largely repeats with respect to Harry Ramos's recantation of his prior testimony. Without conducting an evidentiary hearing, the State court found his recantation not credible. R&R at *12 (summarizing *Jimenez*, 2015 WL 770457, at *5-7). Judge Francis heard testimony from Ramos and found "clear and convincing evidence to overcome the State court's findings." *Id.* Respondent objects to virtually all of the R&R's conclusions with respect to Ramos's credibility. Am. Obj. ¶¶ 34-50. And the Court, having reviewed *de novo* the relevant portions of the R&R, upholds the Magistrate Judge's determinations.

The State court found that Mr. Ramos's recantation was not credible because: "(1) Mr. Ramos testified at trial that he knew the shooter for a few years; (2) Detective Thompson, at trial, testified that Mr. Ramos picked the petitioner's photograph from hundreds of pictures and provided the initial lead; (3) Mr. Ramos appeared to be fearful, not coerced; (4) Mr. Ramos made an equivocal identification in court; and (5) it was not implausible that Mr. Ramos would

mistake a person of Puerto Rican descent for a person of Dominican descent." R&R at *12

(summarizing *Jimenez*, 2015 WL 770457, at *5-7).

In brief, the R&R found clear and convincing evidence rebutting the State court's findings because: 1) the crux of Ramos's recantation – that the shooter was Dominican and so Mr. Jimenez cannot be the shooter – "is consistent among his affidavit, testimony, and testimony at the evidentiary hearing;" 2) at trial, Ramos had difficulty making a courtroom identification; and 3) Ramos can credibly differentiate between Dominican Spanish speakers and Puerto Rican Spanish speakers, a fact supported by Dr. Cutler's testimony. *Id.* at *12-13.

Respondent objects to each of these determinations. First, Respondent argues that the R&R failed to consider how the fact that Ramos testified he knew the shooter for a few years, including his nickname, "Monaguillo," made a misidentification of the shooter much less plausible. Am. Obj. ¶ 34. Given that Ramos never saw Monaguillo in the neighborhood again, Respondent argues that this shows the police arrested the right person. *Id.* That Ramos believed he knew the shooter and then identified Jimenez does somewhat undermine his credibility, but it does not logically follow that it should undermine his recantation rather than his initial identification. There was never any evidence adduced at trial that Jimenez was known by the nickname Monaguillo; rather, Jimenez was nicknamed "Tito" or "Spaz." Ramos is insistent that he knew Monaguillo to be Dominican, which Jimenez is not. It was never developed before or at trial how well Ramos knew Monaguillo, such that it would be implausible for him to mistake him for someone else.[10] And Jimenez reported to his probation officer at least 10 times in the

---

[10] It remains unclear what Harry Ramos believed was the relationship between Mr. Jimenez and this person named Monaguillo. Petitioner offers an understanding in which Ramos, a superintendent in a building on the block where Velazquez and Brana lived, believes the shooter is a person named Monaguillo who hangs around the neighborhood with a group of other Dominican men. Tr. 40:25-42:6. Petitioner believes that Ramos was genuinely unsure of the identification at trial, having not identified Jimenez at the lineup or initially at trial, but that he believed the real perpetrator might be in the courtroom. Petitioner suggest that Ramos's belief of the real

months between the murder and his arrest, including two days before the murder and five days after it, suggesting that he remained in the neighborhood. Reply ¶ 22.

Second, Respondent asserts that the R&R failed to adequately consider how Ramos identified petitioner's photograph out of hundreds of photographs he was shown the day after the shooting, and how this identification was then confirmed by Ms. Velazquez when she identified Jimenez in a photo array. Am. Obj. ¶ 34. While any evidence tending to bolster the credibility of Ramos's first identification implicitly undermines the credibility of his contrary recantation, this criticism weighs more strongly in considering how *compelling* the new evidence is in light of existence evidence of guilt. That both Ramos and Velazquez believed a picture of Jimenez matched their memory of the shooter does not suggest that Ramos is not sincere in his present belief that Jimenez was not the shooter.

Third, Respondent argues that the notion that Ramos could differentiate between Dominican Spanish and Puerto Rican Spanish speakers in inapposite because Ramos never spoke with Monaguillo. Am. Obj. ¶ 37. But a person does not have to speak *with* another to be able to discern dialect. The R&R correctly noted that Ramos testified he *heard* the shooter, who he believed to be a Dominican man nicknamed Monaguillo, use a Dominican slur and speak with a Dominican accent. R&R at *13. While it is true that Petitioner spent time with Dominican people and could have used a Dominican epithet, "mamaguevo" (cocksucker), while being Puerto Rican himself,[11] this speaks more to whether a reasonable juror would find the recantation

---

perpetrator's presence, coupled with pressure from Detective Thompson who allegedly showed Ramos a picture of Jimenez and told him the defendant was Dominican, led to Ramos's ultimate identification of Jimenez. Tr. 42:22-43:19. At the evidentiary hearing, Ramos testified that he did not really "know" Monaguillo, just that he would see this group of Dominicans at this house and bodega near the building where Ramos worked, that they were dangerous, and that one of them was called Monaguillo. H. 47:13-53:10.

[11] *See* Am. Obj. ¶ 37. In fact, one of the alibi witnesses, Danny Hernandez, testified at the evidentiary hearing that it was possible Mr. Jimenez used a Dominican word such as mamaguevo on occasion, although Mr. Hernandez had never heard Mr. Jimenez use Dominican slang. H. 182:10-183:23. Mr. Delgado testified similarly. *See* H. 213:6-214:11.

compelling, rather than to its reliability. Judge Francis found that Ramos testified credibly about his ability to differentiate between Dominican Spanish speakers and Puerto Rican Spanish speakers, R&R at *13, a finding to which the Court owes considerable deference, and Respondent's arguments give the Court no reason to believe this evaluation was flawed. Moreover, while Respondent attacks the testimony of Dr. Cutler, arguing that the study she relied upon actually "shows that the ability of Puerto Ricans to identify Dominicans by speech is questionable," *see* Am. Obj. ¶¶ 38, 50, the R&R clearly stated that her affidavit and testimony provided "weak" support and did not even "preclude the possibility that Mr. Ramos was mistaken in his identification of the shooter as Dominican based on his speech." R&R at *13. As Petitioner conceded at oral arguments, Respondent "did a very good job cross-examining [Dr. Cutler]," but she was not a pivotal witness, and Dr. Cutler's testimony still does provide some support, however minimal, for the idea that a witness may differentiate between dialects, a concept credited by other courts. *See, e.g., Commonwealth v. Echevarria*, 2015 WL 1947741, a *3 (Mass Sup. Ct., Apr. 30, 2015) (crediting testimony that a witness was able to identify whether the perpetrators spoke with a Dominican or Puerto Rican accent). Velazquez also testified at trial that she believed the group of men, including the shooter, were Dominican based upon their accent too. Trial Tr. 209:16-210:18. Upon the Court's *de novo* review of the evidence, including Ramos's testimony at the evidentiary hearing, there is no reason to believe the R&R weighs the evidence incorrectly, and the Court shares Judge Francis's assessment of the credibility of Ramos's testimony regarding why, upon learning Jimenez was Puerto Rican, he recanted.

Fourth, Respondent makes a number of related arguments about Ramos's motive to recant now, and why his original identification of Jimenez is more reliable than his current

testimony. The R&R noted that Ramos identified Jimenez "despite his uncertainty" and that "at trial, he had great difficulty with making a courtroom identification." R&R at *12. Respondent asserts that the trial transcript provides clear evidence that Ramos, who ultimately identified petitioner as the shooter, did not initially identify him at trial because he was scared of Mr. Jimenez. Am. Obj. ¶ 36, 39. It is true that Ramos stated at trial "I don't want to look at him for too long [be]cause he may hurt me." *See* Trial Tr. at 265. But as the R&R observed, even if fear explains Ramos's hesitance at the time, "that is not a sufficient basis for discrediting his subsequent recantation entirely, since the recantation is predicated on his more recent discovery that Mr. Jimenez is of Puerto Rican heritage." R&R at *13.

Respondent also argues that Ramos's present testimony – that he eventually identified Jimenez because of the pressure he felt from Detective Thompson ("the black detective" in Mr. Ramos's telling) – is undermined by the fact that Thompson was present when Ramos refused to identify petitioner at the lineup, but was not present when Ramos did identify him in court. Am. Obj. ¶ 39, n.11. However, these details do not actually undermine the plausibility that Ramos was genuinely uncertain as to whether Jimenez was the shooter, but felt pressure to overcome his doubts and make the positive identification. Respondent, in his attempt to bolster the credibility of Ramos's courtroom identification, is still unable to explain why the Court should credit Ramos's testimony that Jimenez was Monaguillo, even when he simultaneously testified that he knew Monaguillo to be Dominican, which Jimenez was not in fact. *See* Trial Tr. at 265. Without considering the details of Ramos's testimony about Detective Thompson, and Detective Thompson's own testimony, analysis of which would prematurely impact the merits determination, the Court finds it sufficient at this juncture to conclude that any arguments over

Ramos's state of mind in 1994 have limited import for evaluating the credibility of his current testimony.[12]

The only truly direct attack on the credibility of Ramos's recantation comes from Respondent's argument that Ramos, as a friend of Mr. Jimenez's sister, is biased and recanting in order to help her. The R&R rejected this suggestion, finding instead that "[w]hile it is certainly coincidental that Mr. Ramos learned of Mr. Jimenez's ethnicity from Mr. Jimenez's sister, it is not inconceivable that this occurred." R&R at *14. Judge Francis found that it provides a logical explanation for how he came to believe Mr. Jimenez is innocent, and that evidence of their friendship is insubstantial and did not convince the Judge to reject his testimony. *Id.* While Respondent objects to this conclusion, Am. Obj. ¶ 40, as well as the conclusion that Ramos was unlikely to perjure himself on her behalf, *id.* ¶ 41, Respondent offers no direct evidence in support of his different evaluation. The Court, having reviewed Mr. Ramos's testimony, agrees with Judge Francis's interpretation.[13]

Ultimately, the very nature of a witness who recants presents problems of credibility because either the witness did not tell the truth at trial, or is not telling the truth now. *See R&R* at *12 (quoting *Haouari v. United States*, 510 F.3d 350, 353 (2d Cir. 2007) ("It is axiomatic that

---

[12] Respondent makes a related factual objection, arguing that the R&R fails to discuss the testimony of Detective Thompson at the evidentiary hearing. Am. Obj. ¶ 11. According to Respondent, the R&R "tacitly credited Det. Thompson's testimony" by limiting its description of the evidence support petitioner's testimony of "pressure" to Thompson's agreement to help Ramos and his family move out of the area. *Id.*; R&R at *13. The Court does not agree that the R&R's failure to directly address the witness tampering or *Brady* violation evidence is a determination that the merits of petitioner's argument is unfounded. Rather, as made clear by Judge Francis, the R&R specifically declined to address the merits. *See R&R* at *1 n.1. The Court declines Respondent's invitation to draw negative inferences from this omission.

[13] Respondent also objects to the R&R's finding that Mr. Ramos's drug convictions hold little probative value for determining his character for truthfulness. R&R at *14. Respondent argues that the proper question -- what effect the convictions might have on the reasonable juror evaluating his testimony – might yield a different answer. Am. Obj. ¶ 42. However, Respondent does not explain why the convictions would even be presented to the jury, given that under Rule 609, impeachment of a witness's character for truthfulness by evidence of a conviction is governed by Rule 403, *see* Fed. R. Evid. 609(a)(1)(A), and the conviction is not probative of his character. *See Lopez*, 915 F. Supp. 2d at 406.

witness recantations must be looked upon with the utmost suspicion." (internal quotation marks and citation omitted))). However, as with any witness, the court must evaluate recanted testimony "in light of the substance of other evidence, considering the potential motives to be untruthful that the witness may possess, corroboration or the lack thereof, internal consistency, and the inferences or assumptions that crediting particular testimony would require." *Doe v. Menefee*, 391 F.3d 147, 164-65 (2d Cir. 2004).

The core of Mr. Ramos's story, that he felt pressure to make the identification back in 1994, but that since learning Petitioner is Puerto Rican is now convinced that he was not the shooter, is reliable, whatever the flaws of his presentation.[14] In many respects, Ramos's testimony is similar to the recantation in *Hyman v. Brown*, in which Judge Dearie noted the various inconsistencies of the witness's testimony, calling her a "facile liar," but concluded that given that the core of her recant remained consistent and that the state had been unable to impugn her motive for recanting, that it must be that she simply "wished to correct her false accusation." 197 F. Supp. 3d 413, 461-62 (E.D.N.Y. 2016)

Despite Respondent's myriad objections, Judge Francis is correct in his assessment that there is clear and convincing evidence to overcome the State court's findings and, instead, to find Ramos's recantation reliable "for establishing the limited propositions that he has provided multiple inconsistent accounts of what precisely he saw on the day of the shooting, that he has always believed the shooter was Dominican, and that he is now convinced Mr. Jimenez is not the shooter." R&R at *14.

### C. Objections Regarding the R&R's Conclusion that the Claim Is "Compelling"

---

[14] For example, Respondent points to Ramos's evasive answers when asked who brought him to the evidentiary hearing, Tr. at 13:13-14:14 (citing H. 34:11-35:3), as well as his shifting story about where he was standing when the shooting happened. Tr. at 15:4-22.

Having established that Petitioner's claim is credible because it is supported by "new reliable evidence," *House*, 547 U.S. at 537, namely, both the alibi witnesses and Ramos's recantation, the R&R then proceeded to consider whether Petitioner's claim is "compelling." Judge Francis concluded that, based on all of the evidence, "any reasonable juror would have reasonable doubt as to Mr. Jimenez's guilt." R&R at *14. The R&R pointed to four types of evidence supporting this conclusion: "(1) the weakness of the prosecution's case at trial; (2) the alibi witnesses' testimony; (3) the new evidence undermining Mr. Ramos' testimony; and (4) Mr. Jimenez's testimony." *Id.* Again, Respondent makes a number of objections to the R&R's findings here, and the Court addresses each type of evidence and the relevant objections in turn.

### 1. Evaluation of Evidence

First, the R&R concluded that the prosecution's evidence at trial was "particularly weak." *Id.* Specifically, Judge Francis pointed to the lack of any physical or forensic evidence linking Jimenez to the crime. He then continued on to discuss the flaws with the core evidence: the testimony of the two eyewitnesses. The first witness, Ms. Velazquez, testified that she had a clear view of the shooter from a distance of eleven feet for at least thirty seconds, but her two descriptions of the shooter – first, twenty-five to twenty-six years old, five feet six inches tall, Dominican, with long black Jheri curls, olive-colored skin, and khaki shorts and second, male Dominican, age twenty-three to twenty-four, with long black Jheri curls, wearing a white tank top and denim shorts, and driving a red sports car – do not totally match each other, and more importantly, do not match Jimenez. *Id.* Jimenez was seventeen years old at the time of the shooting, had short, close-cropped hair, is Puerto Rican, and did not have a car or drivers' license. *Id.* Velazquez also testified that the shooter held the gun in his right hand, while Jimenez is left-handed. *Id.* The prosecutor, in his closing statement, remarked that she is "not the

best witness in the world." *Id.* at \*15. But despite the inconsistencies, she held firm to her identification of Mr. Jimenez. *Id.*

Respondent objects to the characterization of Ms. Velazquez's testimony. Am. Obj. ¶ 52. Among other objections, Respondent argues that petitioner's arrest photo shows that his hair is not "close-cropped," and that the description of the person with the red car was not a description of the shooter. *Id.* However, upon the Court's evaluation of the evidence and testimony, the R&R's description is fairly accurate. While perhaps petitioner's hair was not "close-cropped," neither can it properly be considered to match Ms. Velazquez's testimony of "long" hair. *See* Declaration of Matthew B. White, Ex. 4 (Arrest Photograph of Petitioner). Similarly, although not perfectly clear in her testimony, Velazquez's testimony suggests that she did not see the man who was harassing her, and that her description of the man with the red car may have been a description of the shooter. *See* Trial Tr. at 190-91; *see also* Reply ¶ 31, n.15. In short, having reviewed the underlying evidence, including Ms. Velazquez's trial testimony, the R&R's description of Ms. Velazquez's testimony and its inconsistencies is fair and accurate.

The R&R continued on to comment that the other eyewitness, Ramos, never provided a description of the shooter at trial other than his neighborhood nickname, "Monaguillo," and equivocated in his identification of Jimenez prior to and during the trial even though he claimed he knew the shooter. R&R at \*15. Respondent lodges many of the objections addressed above regarding Ramos's refusal to identify petitioner at the line-up because of pressure from his father and purported evidence of his fear at trial, and argues that the R&R is giving short shrift to Ramos's prior identification. *See* Am. Obj. ¶ 55. However, much like the Court's *de novo* review of Judge Francis's findings regarding the reliability of the recantation, review of Ramos's pretrial and trial testimony reveals the overall fairness of the R&R's description of his

vacillating. Overall, despite Respondent's objection, *see id.* ¶ 56, the R&R's conclusion that the "two eyewitnesses presented by the prosecution had serious defects" is both accurate and substantiated. R&R at *15.[15] Not every piece of incriminating evidence needs to be explained in order to conclude that the prosecution's case was weak. Ultimately, setting aside evidence raised since trial, any fair review of the trial transcript and evidence reveals the centrality of the testimony of two eyewitnesses, one of whom gave a physical description of a Dominican shooter significantly at odds with Mr. Jimenez's characteristics (Velazquez), and another of whom eventually identified him at trial having not identified him three times previously. Judge Francis accurately described the prosecution's evidence as "particularly weak."

Second, the R&R reviews the new evidence presented by the alibi witnesses. Judge Francis concluded that while Delgado and Hernandez's statements – partially corroborated by the alibi notes of defense counsel and of the prosecutor – "do not eliminate the possibility that Mr. Jimenez committed the crime," their truth makes it "unlikely that Mr. Jimenez could have left the birthday party, walked a mile, committed a murder, and then returned to the gathering without his friends noticing a change in his demeanor or otherwise becoming suspicious." R&R at *15-16. The Court agrees that this testimony is "compelling."

Respondent argues that the alibi is vague, Am. Obj. ¶ 25, that defense counsel's notes do not corroborate their testimony, *id.* ¶ 26, that the alibi is weak given that it does not eliminate the possibility the Jimenez committed the crime, *id.* ¶ 27, and that Petitioner's calm demeanor in his post-arrest video belies Judge Francis's conclusion, *id.* ¶ 28. Whatever purchase these arguments

---

[15] In a footnote, the R&R briefly noted the jury's difficulty in reaching a verdict. *See id.* at *15, n.12. Respondent objects to Judge Francis's commentary, but the Court agrees that the facts of the jury's initial impasse and two full days deliberating following only three days of testimony are "telling." Am. Obj. ¶ 57. The fact that the jury twice requested a read-back of Mr. Ramos's testimony fairly suggests the weight the jurors placed on his in-court identification.

ultimately have when it comes to the merits determination, however, they do not fairly rebut

Judge Francis's holistic assessment of the value of the alibi witnesses – making it less *likely* that

Jimenez committed the crime – within the overall task of evaluating Petitioner's actual

innocence claim.  As the R&R stated, the actual innocence test "does not require absolute

certainty about the petitioner's guilt or innocence." R&R at *16 (quoting *House*, 547 U.S. at

538).  Accordingly, an alibi does not need to preclude guilt in order for the Court to find it

compelling.

Third, the R&R found that Ramos's "already dubious identification" is further

undermined by his later statements, let alone his ultimate recantation.  For example, the R&R

noted that Ramos has made somewhat varying statements regarding his position during the

shooting, what he actually saw happen, and his identification of Jimenez. R&R at *16-17.  Of

course, Ramos has ultimately recanted his identification by affidavit and at the evidentiary

hearing. *Id.* at *17.  Respondent observes that Ramos's description of the shooting is consistent

with the trial testimony of the medical examiner, which the R&R does discuss, and argues that

any waffling or vacillating was caused by Ramos's fear, the evidence for which the R&R

addresses. Am. Obj. ¶¶ 45-45.  Respondent fairly distinguishes *Rivas*, in which the petitioner

resurrected the relevance of his alibi by challenging questionable medical evidence that had ruled

it out, but Judge Francis never presented *Rivas* as factually on point. Am. Obj. ¶ 47.  Moreover,

overall, the R&R placed little weight on the recantation itself, concluding only that "[g]iven that

Mr. Ramos' identification of Mr. Jimenez at the time of trial was so equivocal, his insistence

now that Mr. Jimenez was not the shooter would give reasonable jurors an *additional* reason not

to convict." R&R at *17 (emphasis added).  The Court does not conclude otherwise, and finds

Judge Francis's evaluation of the value of Ramos's testimony to be appropriate.

Fourth, and finally, Judge Francis considered the effect of Petitioner's own testimony. Noting that a petitioner's own testimony must be treated with suspicion, the R&R concluded that Jimenez's testimony in support of his alibi, his maintenance of his innocence from the first date of his arrest, and his demeanor and consistency in the face of cross-examination, lends "additional (albeit limited) support to his actual innocence claim." *Id.* At oral arguments, Respondent argued that the R&R erred by failing to discuss the fact that Mr. Jimenez gave an alias to police at the time of arrest – Rafael, instead of his birth name, Alfredo – and the fact that he was on probation at the time of his arrest for selling drugs. Tr. 23:19-24. While it is possible that those facts could have *some* effect of impeachment on *some* jurors, having conducted a *de novo* review of Mr. Jimenez's testimony at the evidentiary hearing, the Court reaches the same conclusion; petitioner's own testimony provides additional but limited support for his claim. Respondent's mostly conclusory objections to the R&R's treatment of Jimenez himself, *see* Am. Obj. ¶¶ 58-62, are unpersuasive in light of Judge Francis's measured evaluation.

### 2. Overall Determination

On the basis of all of the evidence, both old and new, the R&R concluded that Petitioner established a compelling claim of actual innocence. Respondent "objects to the legal standard employed by the R&R that the 'appropriate question is not whether the testimony conclusively and definitively establishes Mr. Jimenez's innocence, but whether a reasonable juror considering the entire mix of evidence in the case would more likely vote to acquit or to convict." Am. Obj. ¶ 30 (quoting R&R at *16). Respondent asserts that the applicable standard is actually based in § 2254(e)(1)'s presumption that "a determination of a factual issue made by a State court" is correct, and insists that the R&R, in acknowledging petitioner's possible guilt, in ignoring

evidence that petitioner is guilty, and in ignoring the twenty-year delay in raising these claims, failed to overcome the State court's finding by clear and convincing evidence.

Although the R&R did not explicitly state that its conclusion that "any reasonable juror would have reasonable doubt as to Mr. Jimenez's guilt" is based upon clear and convincing evidence sufficient to overcome the State court's presumption, it is strongly implied. Regardless, the Court, in its *de novo* review of the same evidence, does find "clear and convincing evidence" that Mr. Jimenez's actual innocence claim is "compelling," and rebuts the State court's determination. Judge Francis fairly considered the effect the twenty-year delay has on the credibility of the new evidence, *see* R&R at *11 (discussing delay with respect to alibi witnesses), *14 (discussing why Ramos's newfound knowledge of Jimenez's Puerto Rican heritage would have given rise to sudden recantation), and fairly considered the evidence Respondent raises as confirming petitioner's guilt.

As Petitioner noted at oral arguments, it would be helpful to the Court's present task to know more about why trial counsel did not confront Velazquez and Ramos about the fact that Mr. Jimenez was Puerto Rican and not Dominican, as both of them had testified they believed the shooter to be. It would also be useful to know why the alibi was not presented at trial. Nonetheless, facing the gateway determination based on the record developed at trial and the evidence presented since, the Court can only conclude that the evidence supporting petitioner's conviction is thin. The Court's independent evaluation of the evidence, new and old, leads to the conclusion that it is more likely than not that no reasonable juror would have convicted Petitioner in light of the new evidence. *Schlup*, 513 U.S. at 327.

Accordingly, the Court finds that Petitioner has made "a credible showing of actual innocence" that allows him to circumvent the AEDPA's limitations period. *McQuiggin*, 569 U.S. at 392.

## V. Conclusion

For the foregoing reasons, the Court DENIES Respondent's objections and adopts the Report and Recommendation in its entirety. As Petitioner has passed through the actual innocence gateway, the Court will proceed to consider the merits of his petition for a writ of habeas corpus.

Accordingly, the Court will hold a scheduling conference on June 21, 2018 at 3 P.M. The parties must file a joint letter by June 14, 2018 setting forth their procedural proposal for considering the merits of Mr. Jimenez's petition.

SO ORDERED.

Dated: June ~~May~~ 1, 2018
New York, New York

ALISON J. NATHAN
United States District Judge