USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/15/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Rafael Jimenez,

            Petitioner,

    –v–

Tina M. Stanford,

            Respondent.

16-cv-8545 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

    Rafael Jimenez, who is no longer incarcerated,[1] brings this petition for a writ of habeas corpus challenging his state-court conviction for murder. He principally contends that a witness identified him as the shooter at trial only because a detective falsely told the witness that Jimenez was Dominican, and thus matched the witness's earlier description. The witness recanted nearly twenty years later after he learned that Jimenez was Puerto Rican, not Dominican. The Court found that Jimenez had made a strong enough showing of actual innocence to proceed to the merits of his otherwise time-barred claims, including a freestanding claim of actual innocence. The merits of those claims are now before it.

    Statutory text and precedent require the Court to conclude that the limitations on the federal habeas authority under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, apply to Jimenez's actual-innocence claim. AEDPA prohibits

---

[1] Jimenez was released from custody in July 2018, before briefing on this petition was completed.

federal habeas relief for claims decided by a state court on the merits unless the state court's decision rested on an unreasonable determination of fact or law. 28 U.S.C. § 2254(d). A New York court adjudicated Jimenez's actual-innocence claim on the merits in a state habeas proceeding. Thus, AEDPA limits this Court's review to ensuring that the state court's decision was not unreasonable.

Jimenez's claims cannot succeed under this standard. This Court disagreed with the state court in its assessment of the reliability of Jimenez's new evidence, and thus held that he could proceed on the merits of his claims. But the Court cannot reach the conclusion that the state court acted unreasonably in finding that Jimenez's new evidence, even if credited, did not meet the high bar for a freestanding claim of actual innocence. The Court also cannot say that the state court unreasonably decided the facts or the law in concluding that Jimenez had not established a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Because the Court cannot conclude that the state court unreasonably decided Jimenez's habeas claims, AEDPA requires that the Court deny his petition.

**I.   Background**

The factual background of this case is set forth in greater detail in Magistrate Judge Francis's report and recommendation that Jimenez be allowed to pass through the actual-innocence gateway and in this Court's opinion adopting that recommendation. *See Jimenez v. Lilley (Jimenez Gateway Opinion)*, No. 16-cv-8545 (AJN), 2018 WL 2768644 (S.D.N.Y. June 7, 2018); *Jimenez v. Lilley (Jimenez Gateway R&R)*, No. 16-cv-8545 (AJN) (JCF), 2017 WL 4535946 (S.D.N.Y. Oct. 10, 2017). The Court recounts the factual background here only so far as necessary to explain its decision on the petition.

**A.   The Crime**

Around noon on a summer day in 1992, a group of men began harassing Carmen Velazquez as she walked home from a supermarket in the Bronx with her young stepdaughter. *Jimenez Gateway R&R*, 2017 WL 4535946, at *1. She called her husband, Michael Brana, as soon as she got home. Brana rushed home from work and stood outside of their apartment building keeping watch for the men who harassed her. Velazquez and an acquaintance, Harry Ramos, stood with him. *Id.*

A group of men arrived not long after. Velazquez and Ramos remember the ensuing moments differently, but they agree that Brana exchanged heated words with one of the five-or-so men in the group. *Id.* at *2. They agree the man spoke in Spanish with a Dominican accent. After some words (and, in Ramos's telling, some blows), the man stepped aside and another man in the group shot Brana three or four times. According to Ramos, the shooter called Brana a vulgar term common in Dominican Spanish before he fired. *Id.* Ramos knew the shooter as a man called Monaguillo, whom he believed to be Dominican.

Velazquez and Ramos reviewed photograph arrays with police detectives shortly after the shooting. *Id.* at *2–3. Velazquez provided a description of the shooter, but did not see him among the photographs she reviewed. Detectives did not ask Ramos for a description of the shooter because he claimed to know him. He identified a photograph of Rafael Jimenez as the shooter out of several trays each containing several hundred photographs. Detective Kenneth Thompson then ordered a more recent photograph of Jimenez and presented it to Velazquez in another photograph lineup. She recognized him as the shooter immediately. *Id.* at *3.

Jimenez was arrested, and detectives brought Velazquez and Ramos to the precinct to view in-person lineups. *Id.* Ramos made no identification. Detective Thompson believed that Ramos's father, who accompanied him to the lineup, discouraged him from doing so. Velazquez

3

identified Jimenez in the lineup. On her way there, she saw a wanted poster bearing the same photograph of Jimenez that she had picked out of the photograph lineup. However, she testified that she was able to identify him in the in-person lineup based on her memory of the shooting, not the photographs. *Id.* Prosecutors charged Jimenez with murder in the second degree.

### B. The Trial

The State's case at trial rested primarily on the eye-witness testimony of Velasquez and Ramos. Velasquez testified that she had a close, unobstructed view of the shooter and that it was Jimenez. *Id.* at *4; Trial Tr., Dkt. Nos. 1-18–1-23, at 169–71, 175–76, 227–28. But her later testimony had inconsistencies, and she denied having gotten a good look at the man who harassed her as she walked home before the shooting despite making contrary statements to detectives. *See id.* at 213–15. Although she identified Jimenez as the shooter at trial, her description of the shooter did not match him precisely. She described the shooter as looking like he was in his early twenties; Jimenez was seventeen. *Jimenez Gateway R&R*, 2017 WL 4535946, at *14. She described the shooter as having a different hair style. *Id.* She also testified that she believed the men in the group were Dominican based on their accents; however, she acknowledged that she never heard the shooter speak. *Id.*; Trial Tr. at 209–10.

Ramos equivocated in his identification of Jimenez at trial. He testified on direct that he did not recognize the shooter in court. Trial Tr. at 254. He also testified that he was sure the shooter was Dominican. *Id.* at 264–64A. However, on redirect he testified that he knew the shooter and did not want to look at him in the courtroom because the shooter might hurt him. *Id.* at 265. After the prosecutor assured Ramos that no one would hurt him and reminded him that he was under oath, Ramos identified Jimenez as the shooter. *Id.*

The jury requested a read-back of most of the trial testimony and requested a read-back of Ramos's testimony twice. *Jimenez Gateway R&R*, 2017 WL 4535946, at *4. The jurors reported being unable to reach a verdict after several hours, and the court admonished them to continue deliberations. After about two days, they returned a guilty verdict on October 4, 1994. *Id.*

Jimenez exhausted his direct appeals and filed a motion to vacate his conviction in state court under New York Criminal Procedure Law § 440.10. A New York Court denied the motion. *Id.*

### C. The State Habeas Petition

In 2014, Jimenez filed a second § 440.10 motion seeking to vacate his conviction based on actual innocence and a *Brady* claim. *Id.* at 5*; *see People v. Jimenez (Jimenez State Habeas)*, 9 N.Y.S.3d 594 (table), 2015 WL 770457 (N.Y. Sup. Ct. 2015). Jimenez's state petition rested on affidavits from Ramos and two alibi witnesses who did not testify at trial. *Jimenez State Habeas*, 2015 WL 770457, at *3.

Ramos stated in his affidavit dated April 11, 2013, that he learned around 2010 that Jimenez was Puerto Rican rather than Dominican after Ramos's wife struck up a conversation with Jimenez's sister, who lived in the same apartment building. Ramos Aff., Dkt. No. 1-12. He stated that the person who shot Brana was a Dominican man known as Monaguillo, and that Monaguillo had used a vulgar Dominican term to refer to Brana during their altercation, while a different slang term would be more common among Puerto Ricans. He was unsure whether Jimenez was the shooter when he testified and only believed him to be because a detective had told him that Jimenez was Dominican. Upon learning that Jimenez was Puerto Rican many years later, Ramos was "completely certain" that he was innocent. *Id.*

5

Jimenez also submitted affidavits from Amancio Delgado and Danny Hernandez dated January 21, 2014, and December 10, 2013. Dkt. Nos. 1-11, 1-15. Delgado and Hernandez stated in their affidavits that Jimenez was with them on the day of the murder celebrating Hernandez's birthday in front of a grocery store.

The state court was not persuaded by Jimenez's claims of actual innocence. It noted the inherent unreliability of witness recantations, particularly one that came nearly twenty years after the trial. *Jimenez State Habeas*, 2015 WL 770457, at *4–7. It also found the Ramos affidavit not to be credible in light of the trial record. For example, Ramos never suggested in his trial testimony that he identified the shooter as Dominican based on his accent or diction; instead, he said that he had known the shooter for a year or two before the shooting. *Id.*; *see also* Trial Tr. at 263–65. The court concluded that it was more plausible that Ramos was a reluctant witness afraid of retaliation from the shooter than one mislead by a detective's characterization of the shooter's ethnicity. *Jimenez State Habeas*, 2015 WL 770457, at *7–8. Despite these misgivings, the court accepted the reliability of the Ramos affidavit for purposes of argument and found that it nonetheless fell short of establishing Jimenez's innocence.

The state court had similar doubts about the alibi affidavits. For one, it did not find them credible. *Id.* at *8–9. The court noted that they provided only vague details of the day of the murder and lacked other indicia of reliability. Further, the court noted that they placed Jimenez less than a mile from the crime scene at the time of the murder with a group of about five men, some of whom were Dominican. *Id.* It found that the alibi affidavits, even if credited, fell short of establishing Jimenez's innocence.

As to Jimenez's *Brady* claim, the state court found that prosecutors fully disclosed Ramos's failure to identify Jimenez in the in-person lineup and that these issues were fully

6

explored at both a pretrial hearing and at trial. *Id.* at \*12–13. It also rejected Jimenez's claim that the State violated *Brady* by failing to disclose a detective's statement to Ramos that Jimenez was Dominican. *Id.* at \*13.

### D. The Federal Habeas Petition

Jimenez then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. His petition came some twenty years after the expiration of the one-year limitations period in 28 U.S.C. § 2244(d). However, Jimenez contended that the Court should hear his untimely petition because he had made a "credible showing of actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). The Court referred the petition to Judge Francis for a report and recommendation, and Judge Francis held an evidentiary hearing on whether Jimenez had made a threshold showing of actual innocence.

Judge Francis issued a report and recommendation that the Court allow Jimenez to pass through the actual-innocence gateway to a merits adjudication of his claims. *See Jimenez Gateway R&R*, 2017 WL 4535946. The Court adopted the report and recommendation. *See Jimenez Gateway Opinion*, 2018 WL 2768644. The Court found that the affidavits and testimony from Ramos, Delgado, and Hernandez were credible and that any reasonable juror would have reasonable doubt as to Jimenez's guilt when taking this new evidence into account. *Id.* at \*16. In so doing, the Court rejected the state habeas court's credibility determinations. The Court placed heavy weight on Judge Francis's evaluation of the testimony at the evidentiary hearing he held. *Id.* at \*8 ("The State court did not conduct an evidentiary hearing nor hear the witnesses' testimony live, but Judge Francis did.").

The Court then ordered briefing on whether a freestanding actual-innocence claim is cognizable under federal law, whether AEDPA's deferential standard of review governs such a

7

claim, and whether Jimenez can succeed on his claims under that standard. Those questions are now before the Court.

Jimenez was released on parole while this petition was pending. *See* Dkt. No. 67.

## II. Legal Standard

AEDPA narrowly circumscribes the authority of federal courts to grant habeas relief to prisoners in state custody. Under § 2254(d), a federal court may grant relief on a claim adjudicated by a state court on the merits only if the state-court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." "This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (cleaned up). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. After making the showing required by § 2254(d), a state prisoner must also prove a constitutional violation. *Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013).

A federal court's review under § 2254(d) is limited to the record before the state court at the time of its decision. *Pinholster*, 563 U.S. at 181–82; *see also* § 2254(d)(2) (allowing relief only if the state court's decision rested on "an unreasonable determination of the facts *in light of the evidence presented in the State court proceeding*" (emphasis added)). Thus, the Supreme

Court has held that evidence introduced for the first time in federal court has no bearing on review under § 2254(d). *Pinholster*, 563 U.S. at 185; *see Jackson v. Conway*, 763 F.3d 115, 132, 152 (2d Cir. 2014). If a state court does not explain its reasoning in rejecting a claim, a federal court must presume that the state court adjudicated the claim on the merits and uphold that decision unless there was "no reasonable basis for the state court to deny relief" on the record before it. *Harrington*, 562 U.S. at 98.

### III. Discussion

The Court begins its discussion by considering the availability of and governing standard for a freestanding claim of actual innocence when accounting for AEDPA's deferential standard of review. It then turns to whether Jimenez has made the required showing for relief on his claims.

#### A. Claims for Actual Innocence Under AEDPA

The Supreme Court has never recognized a freestanding claim of actual innocence. As the Supreme Court has explained, "federal habeas cases have treated claims of 'actual innocence,' not as an independent constitutional claim, but as a basis upon which a habeas petitioner may have an independent constitutional claim considered on the merits, even though his habeas petition would otherwise be regarded as successive or abusive." *Herrera v. Collins*, 506 U.S. 390, 416–17 (1993). Habeas has historically provided no avenue to relitigate the merits of a jury's verdict once a defendant has received a fair trial. *Id.* at 400–01. And AEDPA's text arguably precludes such a claim in the absence of some other legal or constitutional violation. *See* 28 U.S.C. § 2254(a) (allowing federal habeas relief for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States").

In a line of cases beginning with *Herrera*, the Supreme Court considered whether the Constitution bars the execution of a person who identifies no defect in their trial or sentencing but persuades a federal court of their innocence on collateral review. It has never so held. In *Herrera*, the Court reserved that question but held that, if federal habeas review allowed such a claim, the required showing would be "extraordinarily high." *Herrera*, 506 U.S. at 417. Two Justices would have held that a claim of actual innocence never sounds in federal constitutional law. *See id.* at 427–28 (Scalia, J., concurring). Two thought it might, but that the State's interest in finality would outweigh a petitioner's interest in relitigation in all but the most extreme cases. *See id.* at 419–20, 425–26 (O'Connor, J., concurring). In dissent, three Justices advocated a more robust constitutional rule. But they acknowledged that the standard of review must still be more onerous than that for a gateway claim of actual innocence or a challenge to the sufficiency of the evidence. *See id.* at 442–43 (Blackmun, J. dissenting).

The Supreme Court turned again to this question in *House v. Bell*, 547 U.S. 518 (2006). It again declined to hold that a persuasive showing of actual innocence in a capital case warranted habeas relief absent some other constitutional violation. *Id.* at 554–55. And it reiterated that the showing required for any such claim, even if cognizable, would be extraordinary. It held that the petitioner had failed to meet that bar even though he had "cast considerable doubt on his guilt" such that "it [wa]s more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." *Id.*

The Supreme Court came closest to endorsing a freestanding claim of actual innocence in *In re Davis*, 557 U.S. 952 (2009)—another capital case. In a brief, unsigned order, the Supreme Court transferred a habeas petition filed under its original jurisdiction to a district court for a hearing. Three concurring Justices wrote that they believed the Constitution forbids execution of

10

the innocent. *See id.* (Stevens, J., concurring). Following transfer, the district court held that a petitioner must show by clear and convincing evidence that no reasonable juror would convict in order to prevail on a freestanding claim of actual innocence, and it denied the petition. *See In re Davis (Davis II)*, No. CV409-130, 2010 WL 3385081, at *45, 61 (S.D. Ga. Aug. 24, 2010). The Supreme Court denied review. *Davis v. Humphrey*, 563 U.S. 901 (2011).

These precedents pertain to the viability of a freestanding claim of actual innocence in capital cases. But this is not a capital case. The Justices who have written in support of a freestanding actual-innocence claim in capital cases have reasoned that executing an innocent person would violate the Eighth Amendment's prohibition against cruel and unusual punishment. *See Herrera*, 506 U.S. at 431 (Blackmun, J., dissenting). There is no comparable authority in the non-capital context. 28 U.S.C. § 2254(a); *see Bryant v. Thomas*, 725 F. App'x 72, 73 (2d Cir. 2018) ("Federal law as of yet does not recognize freestanding actual innocence claims.").

At the very least, a freestanding claim of actual innocence requires a much stronger showing than that needed to pass through the actual-innocence gateway to escape procedural default. *House*, 547 U.S. at 555; *see, e.g.*, *Schlup v. Delo*, 513 U.S. 298, 314 (1995); *Herrera*, 506 U.S. at 404. The gateway question of actual innocence "requires a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard." *House*, 547 U.S. at 539 (cleaned up). The analysis for a freestanding innocence claim is different. "Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." *Herrera*, 506 U.S. at 399. Thus, even new evidence that "cast[s] considerable doubt" on a defendant's guilt, such that no reasonable juror could find the defendant guilty beyond a reasonable doubt, is not enough.

11

*House*, 547 U.S. at 554–55. An extraordinary affirmative showing of innocence would be required. *Herrera*, 506 U.S. at 417.

AEDPA poses a further hurdle in cases like Jimenez's where a state court has considered and rejected a claim of actual innocence on collateral review. Under § 2254(d), a federal court may not grant habeas relief to a state prisoner on a claim adjudicated by a state court on the merits unless the state court's determination was unreasonable. Jimenez must therefore not only make the extraordinary showing required by *Herrera*, but also demonstrate that the state court's conclusion that he failed to do so was unreasonable.

The Court is not persuaded by Jimenez's arguments that § 2254(d) does not apply to freestanding claims of actual innocence that have been adjudicated by a state court on the merits, at least outside of capital cases. Section 2254 hints at no such rule and no court has adopted one. Jimenez points to statements by the concurring Justices in *Davis* that AEDPA might raise constitutional concerns "to the extent it bars relief for a death row inmate who has established his innocence." *See Davis*, 557 U.S. 952 (Stevens, J., concurring). Jimenez is not a death row inmate. And he has had a full opportunity to present his claims on state collateral review. *See also Davis II*, 2010 WL 3385081, at *46 (concluding that § 2254(d) applies), *appeal dismissed and cert. denied*, 563 U.S. 901.

Jimenez also contends that the deferential standard in § 2254(d) does not apply because the Supreme Court has "taken this claim out of the AEDPA box" by setting the standard of proof for a hypothetical actual innocence claim at "clear and convincing evidence." Jimenez Br., Dkt. No. 66, at 7. To begin, this Court sees no case in which the Supreme Court has announced such a standard for a freestanding claim of actual innocence by a non-capital defendant. *Cf. Sawyer v. Whitley*, 505 U.S. 333, 343 (1992). But in any case, precedent makes clear that AEDPA applies

12

even when a petitioner must make an unusually strong showing to prevail on the underlying constitutional claim. For example, when a federal habeas court hears an ineffective-assistance-of-counsel claim previously rejected by a state court, it applies a "doubly deferential" standard of review. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Thus, absent any precedent or textual indication to the contrary, the Court concludes that the state court's adjudication of Jimenez's actual-innocence claim is entitled to AEDPA deference.

### B. Jimenez's Actual-Innocence Claim

The Court now considers whether Jimenez's actual innocence claim, which the Court will assume is cognizable, entitles him to relief under AEDPA. The Court cannot say that the state court made an unreasonable determination of fact or law and so must deny relief.

The Court begins by noting how its analysis of Jimenez's freestanding claim of actual innocence differs from that of his gateway claim previously decided by this Court. The Court applied a different legal standard in its earlier opinion than it must apply here. As the Court explained in its opinion allowing Jimenez to pass through the actual-innocence gateway, the applicable standard there was the standard set forth in the Supreme Court's decision in *Schlup*, 513 U.S. at 327. *See Jimenez Gateway Opinion*, 2018 WL 2768644, at *17. And as the Court explained above, the Supreme Court has directed that the standard for a freestanding claim of actual innocence is far higher. *See, e.g.*, *House*, 547 U.S. at 555 ("*Herrera* requires more convincing proof of innocence than *Schlup*."). Consistent with precedent, the Court also deferred to the state court's credibility determinations under § 2254(e)(1) but did not assess whether the state court's overall decision was unreasonable under § 2254(d) as is necessary for Jimenez's substantive claim for relief.

The Court relied heavily on Judge Francis's assessment of witness testimony at the evidentiary hearing before him in concluding that Jimenez had made a threshold showing of actual innocence. As a general matter, however, a federal court may grant relief under § 2254(d) only if the state court reached an unreasonable decision on the record before it. *Pinholster*, 563 U.S. at 186. Jimenez suggests in a footnote that a claim of actual innocence should be an exception to this rule. *See* Jimenez Br. at 8 n.9. *But cf. Rivas v. Fischer*, 780 F.3d 529, 532–33 & n.1 (2d Cir. 2015) (excluding evidence adduced in an evidentiary hearing on a gateway claim of actual innocence from the court's review under § 2254(d)). Although no court has so held, this Court assumes for the sake of argument that it may consider the testimony before Judge Francis in its review of Jimenez's freestanding actual-innocence claim under § 2254(d).

Applying the deferential standard of review in § 2254(d) and considering the high bar for a freestanding claim of actual innocence under *Herrera*, the state court's decision was not unreasonable.

The Court begins with the law. Though the state court did not expressly say that it was analyzing Jimenez's claim under federal law in addition to state law, it relied on federal precedents including *Herrera*. *See id.* at *3. Jimenez concedes that this Court must presume the state court adjudicated his federal claim on the merits. *See* Jimenez Br. at 8 n.8 (citing *Johnson v. Williams*, 568 U.S. 289, 301 (2013)). The state court held that to prevail on a claim of actual innocence, Jimenez bore the burden to establish his actual innocence by clear and convincing evidence. *See Jimenez State Habeas*, 2015 WL 770457, at *3. It explained that new evidence that merely cast doubt on his guilt or rendered the trial evidence legally insufficient was not enough to prevail on his claim. *Id.* at *8. This analysis is broadly consistent with the limited guidance the Supreme Court has provided. *See, e.g.*, *House*, 547 U.S. at 555 (holding that it was

14

not enough that a petitioner's new evidence "cast considerable doubt on his guilt"); *Herrera*, 506 U.S. at 443 (Blackmun, J., dissenting) (agreeing that even if an actual-innocence claim were cognizable, a petitioner would bear "the burden of proving his innocence, not just raising doubt about his guilt"). Because the Supreme Court has not "squarely established" a different standard for such a claim, this Court cannot say that the state court's decision was contrary to clearly established federal law. *Knowles*, 556 U.S. at 122. Jimenez hardly contests this point.

Nor can the Court say that the state court unreasonably applied this standard to the evidence before it. True, this Court disagreed—strenuously—with the state court's assessment of the credibility of Ramos and the alibi witnesses after considering Judge Francis's assessment of their testimony at the evidentiary hearing before him. However, the state court found that even if those witnesses were reliable, their accounts would not prove Jimenez's innocence under the demanding standard for a freestanding innocence claim. *See Jimenez State Habeas*, 2015 WL 770457, at *8–9.

At the very least, "fairminded jurists could disagree" on whether the new evidence from Ramos and the alibi witnesses met the extraordinarily high bar for a freestanding claim of actual innocence. *Harrington*, 562 U.S. at 101; *see House*, 547 U.S. at 555. Even with the benefit of further testimony, Judge Francis agreed with the state court that neither the alibi accounts nor Ramos's recantation affirmatively established Jimenez's innocence. *See Jimenez Gateway R&R*, 2017 WL 4535946, at *16 ("To be sure, these alibi statements—even if fully credited—do not eliminate the possibility that Mr. Jimenez committed the crime."); *id.* at *17 (noting that Ramos had "repeatedly vacillated" in his account of the incident and that his statements were called into question by Velasquez's trial testimony); *Jimenez State Habeas*, 2015 WL 770457, at *8–10; *see also Jimenez Gateway Opinion*, 2018 WL 2768644, at *15. This new evidence "cast

considerable doubt on his guilt," but a freestanding claim of actual innocence requires more. *House*, 547 U.S. at 555.

The Court also notes that one of the district-court cases it relied on in considering Ramos's recantation has since been reversed. *See Hyman v. Brown*, 197 F. Supp. 3d 413, 461 (E.D.N.Y. 2016), *rev'd*, 927 F.3d 639 (2d Cir. 2019). In *Hyman*, the Second Circuit emphasized that cases finding actual innocence (for purposes of the less demanding gateway question) have typically involved physical evidence that precluded the defendant's guilt or persuasive evidence that another suspect committed the crime. *See Hyman*, 927 F.3d at 665. Evidence that merely cuts against the testimony of a state witness—even an important state witness—is not enough. Evidence supports a petitioner's actual innocence if it shows "either that he *did not* commit, or *could not* have committed, the crimes of conviction." *Id.* As the state court and Judge Francis found, the new evidence here does neither. The alibi witnesses placed Jimenez within walking distance of the murder for an uncertain period of time. Ramos's recantation undermines the testimony of only one of two witnesses who identified Jimenez from photographs and at trial. The inconsistencies in Velazquez's prior descriptions of the shooter similarly reduce the proper weight a juror might give to her testimony but do not affirmatively show Jimenez's innocence.

The closest Jimenez comes to a claim that he could not have committed the crime is his point that he is Puerto Rican, while Ramos and Velazquez described the shooter as Dominican. However, Velasquez's trial testimony reflects that she merely assumed the shooter was Dominican because of the "neighborhood" and his presence in a group that included people who spoke Spanish with a Dominican accent. Trial Tr. at 206, 209. She testified that she never heard the shooter say anything, with a Dominican accent or otherwise. *See Jimenez State Habeas*, 2015 WL 770457, at *4; Trial Tr. at 210. Ramos now claims that he believed the shooter was

16

Dominican because he used a Spanish slang term that was more common among Dominicans than Puerto Ricans. However, he testified at trial that he could identify Jimenez as the shooter because he knew him personally and never mentioned the shooter's accent. *See Jimenez State Habeas*, 2015 WL 770457, at *4–6; Trial Tr. at 264–65. Fairminded jurists could draw different conclusions about the persuasiveness of this evidence.

On balance, considering the extraordinarily high showing that would be required for a freestanding claim of actual innocence and the deference due a state court's merits adjudication under AEDPA, the Court cannot find that the state court's decision represents an error "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. It must thus deny relief on this claim. The Court emphasizes that it does not decide whether AEDPA might permit a freestanding claim of actual innocence by a non-capital defendant in other circumstances.

### C. Jimenez's *Brady* Claim

The Court turns lastly to Jimenez's *Brady* claim. It finds that AEDPA precludes relief on this claim, too.

Jimenez contends that Detective Thompson falsely told Ramos before he testified that Jimenez was Dominican rather than Puerto Rican. This, Jimenez says, was essential to Ramos's identification at trial because Ramos knew the shooter to be Dominican based on his accent and diction. Jimenez contends that this exchange was exculpatory and should have been disclosed to the defense. The sole evidentiary support for this claim presented in the state court was Ramos's affidavit, in which Ramos states, as translated in Jimenez's submission, as follows:

> I was arrested for selling drug then the black detective brought me to court to testified and the placed me in a small room and showed me a picture allegedly of the person who killed Michael when they showed me the picture I asked if he was Dominican o Boricua [Puerto Rican] and he told me that he was Dominican I asked him because I wanted to make sure that he was not Puerto Rican because I knew that the person who killed him

17

>was Dominican. And when he showed me the picture I was still uncertain that its why I asked the detective if he was Dominican o Puerto Rican when he said to me that he was Dominican I thought that they had him and I thought that he was the one who killed Michael. When I asked him again if he was Dominican and he said he was I trusted the detective and the wife because the wife said he was that's what the detective said and I trusted him.

Ramos Aff. (errors and alteration in original). This Court's review on this claim is limited to assessing the reasonableness of the state court's decision on the evidence before it. *See Pinholster*, 563 U.S. at 181; *Harrington*, 562 U.S. at 101; 28 U.S.C. § 2254(d). To the extent Jimenez seeks to advance a distinct claim for witness tampering, that claim was not briefed before the state court and so this Court need not consider it. *See* § 2254(b); State Habeas Petition, Dkt. No. 1-28, at 10–12. In any case, these claims rest on the same facts and the Court would deny relief for substantially the same reasons.

"There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The state court recognized and reasonably applied the correct legal standard.

First, as discussed above, fairminded jurists could disagree about the credibility of the Ramos affidavit, particularly without the benefit of his testimony in the evidentiary hearing before Judge Francis. As the state court observed, this affidavit came nearly twenty years after trial, and Ramos's statements about the centrality of the shooter's dialect to his identification contradict his trial testimony. *See Jimenez State Habeas*, 2015 WL 770457, at *5–7.

Second, fairminded jurists could disagree as to whether the Ramos affidavit identified any evidence favorable to the defense that prosecutors wrongfully withheld. The state court

18

found that prosecutors timely disclosed that Ramos failed to identify Jimenez in the in-person lineup. *Id.* at *12. Though Jimenez argued in the state court that the prosecution failed to disclose "multiple statements that he did not recognize Jimenez and did not believe him to be the shooter," the Court sees no indication that any such statements were withheld in the Ramos affidavit or elsewhere in the record. *See* State Habeas Petition at 10.

Jimenez now appears to abandon that broader claim and focuses solely on the exchange between Ramos and the detective immediately before Ramos's testimony, in which the detective told Ramos that Jimenez was Dominican. *See* Jimenez Br. at 17–18; Jimenez Initial Br., Dkt. No. 1-1, at 3–6. The Ramos affidavit supplies scant details of their conversation. It explains that Ramos was inwardly "uncertain" about his identification because of Jimenez's ethnicity. However, the only statements made aloud that it identifies are that Ramos "asked the detective if [Jimenez] was Dominican o[r] Puerto Rican" and that the detective "said to [Ramos] that he was Dominican." Ramos Aff. This brief exchange, as characterized in Ramos's affidavit, contains no discussion of the shooter's dialect or Ramos's misgivings about his identification. It reflects only that Ramos believed Jimenez was Dominican. These statements had no apparent bearing on Ramos's trial testimony that he recognized Jimenez as the shooter because he knew him for a year or two before the trial. *See Jimenez State Habeas*, 2015 WL 770457, at *6; Trial Tr. at 264–65.

Third, fairminded jurists could disagree as to whether any failure to disclose the exchange between Ramos and the detective was prejudicial. As the state court observed, both Ramos's belief that Jimenez was Dominican and the issues surrounding Ramos's willingness to identify Jimenez were "fully explored during the defendant's pretrial hearing and jury trial." *Jimenez State Habeas*, 2015 WL 770457, at *11–13. Ramos testified at trial that he believed Jimenez

19

was Dominican.  There is no indication that the defense's knowledge of the exchange between Ramos and the detective would have had any impact on the trial questioning or testimony.

Each of these grounds provides a reasonable basis to deny relief on Jimenez's *Brady* claim.  AEDPA thus requires this Court to defer to the state court's decision on this claim.

## Conclusion

AEDPA limits this Court's review of a state habeas decision to whether the state court made an unreasonable determination of fact or law.  The Court cannot say the state court that rejected Jimenez's actual-innocence and *Brady* claims so grievously erred.  It thus DENIES his petition for a writ of habeas corpus.  The Court finds that Jimenez has made a substantial showing of the denial of a constitutional right on his actual-innocence claim but not on his *Brady* claim, and so issues a certificate of appealability limited to his actual-innocence claim.  *See Love v. McCray*, 413 F.3d 192, 195 (2d Cir. 2005) (per curiam).  The Clerk of Court is respectfully directed to enter judgment and close the case.

SO ORDERED.

Dated: September 15, 2021
New York, New York

_____
ALISON J. NATHAN
United States District Judge